621 So.2d 618 (1993)
STATE of Louisiana, Plaintiff-Appellee,
v.
Glen P. LINDSEY, Defendant-Appellant.
No. 24784-KA.
Court of Appeal of Louisiana, Second Circuit.
June 23, 1993.
Rehearing Denied August 12, 1993.
*620 Cook, Yancey, King & Galloway by Curtis R. Shelton, Shreveport, for defendant-appellant.
Richard Ieyoub, Atty. Gen., James M. Bullers, Dist. Atty., Whitley R. Graves, Asst. Dist. Atty., Benton, for plaintiff-appellee.
Before SEXTON, NORRIS and STEWART, JJ.
NORRIS, Judge.
The defendant Glen P. Lindsey was charged by bill of information with armed robbery. La.R.S. 14:64. He was convicted as charged by a unanimous jury and was subsequently sentenced to fifty years at hard labor without benefit of parole, probation or suspension of sentence. For the reasons expressed, we reverse the conviction and sentence, and remand for new trial.

FACTS
At approximately 2:00 a.m. on January 4, 1991, Jack Taylor answered the door of his Bossier apartment. There he found Debbie Pate, an acquaintance whom he had seen on three or four previous occasions. According to Pate, she went to Taylor's apartment, along with defendant Glen Lindsey, his girlfriend Becky Pageant[1], and Scott Blevins[2] for the purpose of introducing Ms. Pageant to Taylor so that she could "prostitute with him." (R.p. 217.) Taylor and Pate spoke for a few minutes before he asked her to bring Ms. Pageant into the apartment. Leaving the apartment door open, Pate walked outside, purportedly, to get Ms. Pageant. At this point, Lindsey and Blevins rushed into the apartment, hit Taylor in the head with a tire tool, pushed him onto his bed, and held a pillow over his face. The two men repeatedly struck Taylor with the tire tool and held a gun to his head as they took his wallet and approximately $100.00, a television, a video cassette recorder, some speakers, a .38 caliber revolver, and a gun belt.
Debbie Pate, who testified under a grant of limited immunity,[3] stated that she was taken by surprise and did not know that Lindsey and Blevins were planning to rob Taylor. She stated that she felt bad for Taylor as he screamed from the blows inflicted upon him by Lindsey and Blevins.
According to Taylor, however, Debbie Pate directed the robbery. Taylor testified that, although he was not able to see anything while the robbery took place, and thus was unable to identify the two men, he was able to hear what was being said during the ordeal. Taylor stated that the two men asked Pate what she wanted; she responded, "I want everything." (R.p. 191). Taylor and Pate both testified that one of the men asked Pate if she wanted him to kill Taylor; Pate told him not to. (R.pp. 193, 213). According to Pate, of the two men, it was Lindsey who held the gun against Taylor and asked if he should kill him. (R.p. 213).
Following the robbery, the men took Taylor outside and ordered him to walk away from them with the pillow still positioned over his face. Taylor managed to get a glimpse at the hood of the car that the *621 perpetrators were driving and noticed that it was square like that of a Ford or an old Plymouth. However, he was not able to give a thorough description of the car to the police.
The Bossier City Police arrested Debbie Pate on January 15, 1991. She subsequently implicated Lindsey as a participant in the robbery, and both she and Lindsey were charged by bill of information with armed robbery. On January 16, 1991, Detective Fred Gregory went to Lindsey's residence and, after obtaining written permission, searched a brown Plymouth belonging to Lindsey's girlfriend. He recovered a tire tool from the floorboard behind the driver's seat. The detective considered it pertinent that the tire tool was in the passenger compartment of the car rather than in the trunk. (R.p. 237). The state argued that the tire tool found in the car was the same tire tool with which Taylor had been beaten. The reason the tire tool was in the passenger compartment rather than in the trunk, argued the state, was because after using it in the commission of a crime, the assailants did not take the time to place it back in the trunk but naturally carried it into the passenger compartment with them. (R.p. 283). Nonetheless, forensic tests conducted on the tire tool did not reveal the presence of blood or any other physical evidence which might link it to the robbery.
Defense witness Carla Michaels provided Lindsey with an alibi, testifying that she was with Lindsey at his apartment until approximately 2:30 or 3:00 a.m. on the morning of January 4, 1991. She stated that she went to high school with Lindsey and had not spoken to him in years but went to visit him that morning after receiving a phone call from him at approximately 12:30 a.m. (R.pp. 252-53). Her 17-year-old daughter Angie Anders testified that she answered the phone when Lindsey called for her mother that morning. Ms. Anders also testified that she spoke to Lindsey again over the phone at approximately 2:30 a.m. when her mother phoned to request that she unlock the door in advance of her return home. (R.pp. 267-68).
In contrast to the testimony of Michaels and Anders, Detective Gregory testified that in the post arrest statement given by Lindsey, Lindsey never mentioned being with Carla Michaels on the morning of the robbery. Instead, Lindsey stated that he was at home with his girlfriend Becky Pageant. While Carla Michaels did state that she thought someone was in bed at Lindsey's apartment while she visited with Lindsey, and that person conceivably could have been Becky Pageant, the state argued that if indeed Lindsey had been with Michaels at the time of the robbery, he certainly would have mentioned that in his statement. According to Detective Gregory, Lindsey further said in his post arrest statement that Blevins and Pate came to his apartment and reported that they "had took a man for his merchandise over in Bossier." (R.p. 280).
Prior to trial, Lindsey's attorney obtained an order of discovery requiring the state to disclose all information possessed by the district attorney which was favorable to the defendant and material or relevant to the issue of guilt or punishment. (R.pp. 10-11).
Lindsey was convicted on January 7, 1992. On the morning following his conviction, Ms. Pate pled guilty to a reduced charge of accessory after the fact of armed robbery and received an agreed upon sentence of two years with credit for time served. Upon learning of the plea agreement, defendant filed a motion for new trial alleging that the state, in violation of its continuing duty of discovery, had failed to disclose that it offered Ms. Pate a plea bargain during the jury's deliberation and before trial had concluded. Additionally, he alleged that even before Ms. Pate testified, she and the state had negotiated a plea bargain and established a relationship of trust. The state's failure to disclose this information, argued Lindsey, was a violation of the state's duty to provide the defendant with exculpatory evidence.
After a hearing on the motion, Judge Kitchens concluded that because the plea bargain was not negotiated until after Ms. Pate testified, and was not consummated *622 until the day after the trial, the state had not violated its duty to disclose exculpatory evidence by failing to inform defendant of the plea bargain.
Defendant appeals, asserting as error the trial court's refusal to grant his motion for new trial. In additional assignments of error, he asserts that the state's evidence was insufficient to support a conviction and that his sentence is excessive. We find that defendant's Brady argument has merit, and that he should be granted a new trial.

SUFFICIENCY OF EVIDENCE
Defendant urges that the evidence presented by the prosecution was insufficient to support the conviction for armed robbery. Under State v. Ruff, 504 So.2d 72 (La.App.2d Cir.), writ denied 508 So.2d 64, 65 (La.1987), a reviewing court must consider a defendant's insufficiency of evidence claim even though he successfully proves a Brady violation. In reviewing the sufficiency of evidence to support a conviction, the reviewing court must examine the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Captville, 448 So.2d 676 (La.1984); State v. Bellamy, 599 So.2d 326 (La.App. 2d Cir.), writ denied 605 So.2d 1089 (La.1992).
In the instant case, the jury clearly believed Pate's testimony over that offered by the defense's witnesses. Although the uncorroborated testimony of an alleged accomplice should be viewed with great caution, such testimony is sufficient to form the basis of a conviction. State v. Holland, 544 So.2d 461 (La.App. 2d Cir.1989), writ denied 567 So.2d 93 (La.1990). Based on this record, viewing the evidence in a light most favorable to the state, and without considering the Brady violation, we conclude that there was sufficient evidence to convict. This assignment does not merit reversal.

THE BRADY VIOLATION
Defendant's argument for new trial is based upon the precept that suppression by the prosecutor of material evidence favorable to the accused justifies a new trial irrespective of the good faith or bad faith of the prosecution. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); State v. Bailey, 367 So.2d 368 (La.1979). The Supreme Court has rejected any distinction between exculpatory evidence and impeachment evidence and, in Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), extended the Brady rule to cases in which evidence adversely affecting the credibility of government witnesses is withheld from the defense. The prosecution's duty to disclose exculpatory matter applies whether there has been a specific or general request for discovery as well as when there has been no request at all. United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Where such information is not disclosed, and it is material in the sense that its suppression undermines confidence in the outcome of the trial, then constitutional error occurs, and the conviction must be reversed. Giglio, supra; United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). The evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. Bagley, supra.
Under Louisiana law, the prosecution is not required to provide unlimited discovery. La.C.Cr.P. art. 723. However, the state must comply with the requirements of Brady and its progeny, and the provisions of the Code of Criminal Procedure pertaining to discovery in criminal cases. La.C.Cr.P. art. 716 et seq.; State v. Johnson, 544 So.2d 767 (La.App. 3d Cir. 1989). Under La.C.Cr.P. art. 729.3, the state has a continuing duty to disclose, even during trial,[4] and the jurisprudence *623 holds that if the state does not comply with this obligation, a defendant's conviction may be reversed if such noncompliance prejudiced the defendant. State v. Vaccaro, 411 So.2d 415 (La.1982).
The events surrounding Ms. Pate's testimony and eventual plea arrangement were revealed at the hearing on defendant's motion for new trial. Pate's attorney Joseph Clark, Sr. testified that discussions of a possible plea agreement began from the onset of the case. (R.p. 315). These discussions were held between Clark and Assistant District Attorney Whitley Graves only and were presumably relayed to Pate by Clark. According to Clark, he and Graves discussed that no specific plea agreement could be entered into before Pate took the witness stand. He assumed the reason for the state's reluctance to agree to a specific plea was so that Pate could not be impeached on the stand. However, Clark stated that the discussions between him and Graves did involve the possibility of what Pate might be allowed to plead to if, in fact, she decided to testify and if her testimony were deemed credible. (R.p. 316). The specific pleas discussed ranged the entire spectrum, down to the plea ultimately accepted by the state, accessory after the fact. Clark also admitted that prior to trial he and Graves discussed the possibility of Pate's getting a sentence which would result in her release a short time after entering a guilty plea. (R.pp. 318-19). His understanding, based on his discussions with Graves, was that Graves would give consideration in plea negotiations to Pate for testifying truthfully, and he (Clark) had faith that Graves would live up to it. He advised Pate accordingly, telling her to trust that she would receive the promised consideration. (R.p. 319). Nonetheless, Clark stated that he was "going in there [court] blind" and that everything was "left totally up in the air." (R.p. 319). He further stated that he trusted the prosecutor only "[a]s far as any defense attorney can trust the district attorney's office[.]" (R.p. 320.) However, he agreed that he trusted the prosecutor to the extent that he was willing to allow his client to testify at Lindsey's trial. (R.pp. 320-21).
Assistant District Attorney Whitley Graves did not dispute the testimony of Pate's attorney. He further explained that at the time of Lindsey's trial in January 1992, Ms. Pate had been held in custody for nearly a year following her arrest in January 1991. During that time, Pate's attorney contacted him on several occasions seeking various pleas ranging from attempted armed robbery to accessory after the fact. In September of 1991, Pate herself sent a letter to the district attorney's office stating that she was willing to testify against Lindsey, she was the only person who could positively identify him as a perpetrator, and she was eager to obtain a favorable plea bargain. Graves never spoke directly to Pate, but informed her attorney that he would not enter into a specific plea agreement before she testified. However, he further informed Pate's attorney that if Pate still chose to testify against Lindsey, he would "take that into consideration when we start to do our plea bargaining." (R.p. 330). He stated that he told Pate's attorney that he and Ms. Pate would just have to trust that he would be "fair and equitable about the situation." (R.p. 331.)
Graves further testified that after the close of evidence and the jury's departure for deliberation, but before the verdict had been rendered, Pate's attorney approached him to discuss the plea agreement. Graves stated that at that time he informed Pate's attorney that he would be willing to accept a plea of accessory after the fact. He was willing to do this, he said, because in light of the evidence adduced at trial, he thought he would have a problem convincing a jury that Pate had prior guilty knowledge of the actions planned by Lindsey and his accomplice.[5] (R.p. 331). Graves stated that the charge to which Pate would actually plead *624 was confirmed while the jury was still in deliberation. (R.pp. 331, 334). The sentence, however, was not confirmed until the next morning when the plea agreement was actually entered.
Consistent with Graves's testimony, Bossier Parish District Attorney Jim Bullers testified that he was aware that Pate wanted to testify and that Clark wanted consideration for the testimony. He stated that Graves had full authority to conduct the plea bargain and that he himself probably did not learn of the plea until after it had been entered. (R.pp. 341-42).
Although Pate did not appear at the hearing on the motion for new trial, she testified at trial that she was not promised, nor did she expect, anything in exchange for her testimony. (R.pp. 211, 224.) In an effort to discredit her testimony, defendant called Judy Silks and Milton Shubbie to testify at the hearing. Silks, a convict at the Louisiana Correctional Institute for Women, had been incarcerated with Pate in Bossier Parish prior to, and during, Lindsey's trial. She testified that several days before Christmas 1991, Pate told her that she had struck a deal whereby she would be released from jail almost immediately if she turned state's evidence against Lindsey. (R.p. 346.) Silks denied any association with Lindsey. However, when asked on cross examination how Lindsey and his attorney learned of her knowledge of Pate's statements concerning the alleged deal, Silks stated that she relayed the information to Lindsey's cellmate Tony Merriman. She further admitted that Merriman had performed legal work for her at no charge, but denied owing him a favor. (R.pp. 348-49).
Milton Shubbie, a convict at Wade Correctional Institute, testified that while he was jailed in Bossier Parish, Pate contacted him to prepare a legal document for the prosecutor to sign giving her two years time served in exchange for testimony against Lindsey. According to Shubbie, Pate stated that she had written to Bossier Parish District Attorney Jim Bullers informing him that she would testify against Lindsey only if she got a deal up front. Pate further told him that if she did not get the deal, she would tell the truth, that Lindsey "wasn't with me" during the robbery. (R.p. 354). On cross examination, Shubbie admitted that he had been Lindsey's cellmate for approximately three months, but, like Silks, denied owing any favors. (R.p. 358).
At the conclusion of the hearing, the trial judge denied the motion for new trial, ruling that the plea bargaining had not gone far enough to require disclosure by the state. He specifically found that a plea bargain had not been consummated by the parties until the day after the trial. (R.p. 368). He further found that a relationship of trust which had developed between the state and Pate or her attorney was not anything which need be disclosed by the state.
The initial issue for our consideration is whether the prosecutor failed to disclose information to which the defendant was entitled under Brady and Giglio. We note from the outset that the state's constitutional requirement to disclose material evidence favorable to the defendant is not limited to formal, consummated, binding agreements exacted of the state by a state witness. In United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), two principal government witnesses assisted the Bureau of Alcohol, Tobacco and Firearms in conducting an undercover investigation of the defendant. Although the defense had sought discovery of "any deals, promises or inducements made to witnesses in exchange for their testimony," the prosecution failed to disclose documents wherein the witnesses were offered payment for the provision of information "upon the accomplishment of the objective sought to be obtained by the use of such information to the satisfaction of [the government]." The documents were not signed by government officials nor was a monetary amount written on them until after the trial. Upon learning of the documents, the defendant moved to vacate his sentence, alleging that the government's failure to disclose the contracts violated his right to due process under Brady, as the *625 contracts could have been used to impeach the witnesses. The government argued that it had no duty to disclose the contracts because they did not constitute a promise of reward.
The Supreme Court, after concluding that "the Government is technically correct that the blank contracts did not constitute a `promise of reward,'" stated that:
[T]he prosecutor failed to disclose that the possibility of a reward had been held out to [the witnesses] if the information they supplied led to "the accomplishment of the objective sought to be obtained ... to the satisfaction of [the Government]." (cite omitted) This possibility of a reward gave [the witnesses] a direct, personal stake in respondent's conviction. The fact that the stake was not guaranteed through a promise or binding contract, but was expressly contingent on the Government's satisfaction with the end result, served only to strengthen any incentive to testify falsely in order to secure a conviction.
Id. at 683-84, 105 S.Ct. at 3384 (emphasis added). After so holding, the Court remanded the case for a determination whether there was a reasonable probability that, had the inducement offered by the government to the witnesses been disclosed, the result of the trial would have been different.
Indeed, the Court had suggested as early as its decision in Giglio, supra, that something less than an explicit promise to reward a witness in return for his testimony, might be sufficient to trigger the disclosure requirement of Brady. In Giglio, one assistant prosecutor promised a government witness that if he testified, he would not be prosecuted. However, another assistant prosecutor, unaware of his colleague's promise, told the witness that he would definitely be prosecuted if he did not testify and that, if he did testify, he would be obliged to rely on the "good judgment and conscience of the Government" as to whether he would be prosecuted. Neither of these representations was disclosed to the defendant. While the Court's reversal and remand for new trial was based upon the actual promise made by the initial assistant prosecutor, it stated in dictum that the later prosecutor's statement "standing alone, contains at least an implication that the Government would reward the cooperation of the witness, and hence tends to confirm rather than refute the existence of some understanding for leniency." Giglio, 405 U.S. at 153 n. 4, 92 S.Ct. at 765 n. 4.
In State v. Bailey, 367 So.2d 368 (La. 1979), our supreme court reversed a defendant's conviction and granted a new trial upon finding that the state's witness might have gained a mere impression, without any overt representation by the state, that his testimony on the state's behalf would lead to his release from the charge pending against him. On the day before the witness was scheduled to testify at defendant's trial, he was arrested on a felony charge. An assistant district attorney, through direct intervention with the sheriff's office, had the witness released from jail without bail so that he could testify against the defendant while not in custody. The state never promised, nor did it even indicate the possibility, that the charge against the witness would be dropped if he testified. Nevertheless, the court held that the prosecution should have disclosed the witness's arrest and release to the defense. The witness's release without bond, said the court, created the inference that he received the impression that his testimony would result in the state's dropping of charges against him; had this information been disclosed to the defense, it could have possibly negated the witness's credibility. Id. at 370-71.
In the instant case, the prosecutor admitted at the hearing on the motion for new trial that he informed Pate's attorney that "I take into consideration anything that a co-defendant does in furtherance of a case against a co-defendant in my consideration when we do enter into actual plea bargain agreements." (R.p. 330). He further admitted that he and Pate's attorney had discussed various possible pleas prior to defendant's trial. Pate's attorney stated that they discussed the possibility of what Pate might be allowed to plead to if she decided to testify and if her testimony were *626 deemed credible. These discussions even encompassed the possibility of Pate's getting a sentence which would result in her release a short time after she entered a plea. Although the prosecutor was careful never to guarantee that the state would permit Pate to plead to a specific lesser charge for a short sentence, he did admit telling Pate's attorney, after discussing various possible plea options, that "[w]hatever Ms. Pate does I will take that into consideration when we start to do our plea bargain agreements." (R.p. 330). He further admitted informing Pate's attorney that Pate and he "would just have to trust me that I would take it [her testimony] into consideration and be fair and equitable about the situation." (R.p. 331).
While we agree with the trial court that the representations made by the prosecutor to Pate's attorney do not constitute a consummated plea agreement, we do not agree that the state's representations did not go far enough to require disclosure by the state under Brady.
The Brady rule is based on the requirement of due process. Bagley, supra. It requires disclosure of evidence that is both favorable to the accused and material either to guilt or to punishment. Impeachment evidence, because it is evidence favorable to the accused, falls within the Brady rule. If disclosed and used effectively, impeachment evidence may make the difference between conviction and acquittal. As the Supreme Court noted in Bagley:
The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.
473 U.S. at 676, 105 S.Ct. at 3380 (quoting Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959)).
In the instant case, the prosecutor failed to disclose to Lindsey that he promised Pate favorable consideration if she testified and if her testimony were deemed credible. This promise gave Pate a direct, personal stake in Lindsey's conviction. The fact that a specific reward was not guaranteed through a promise or a consummated plea agreement, but was expressly contingent on the state's good faith and satisfaction with Pate's testimony, served only to strengthen any incentive to testify falsely in order to secure Lindsey's conviction.
At a minimum, the assertions made by the state to Pate's attorney were sufficient to give Pate the impression that convincing testimony favorable to the state would benefit her in her own case. See Bailey, supra. Indeed, such an impression would have been absolutely correct, as the state accepted a plea bargain immediately following the close of evidence, even before the jury had returned the verdict and the trial had concluded. This plea agreement was never disclosed to the defense in spite of the requirement in La.C.Cr.P. art. 729.3 and corresponding jurisprudence that the state disclose exculpatory evidence as it becomes available prior to or during trial. See State v. Fuller, 414 So.2d 306 (La. 1982).
Moreover, the prosecutor's failure to correct Pate's assertion at trial that she was not expecting consideration in return for her testimony, only further exacerbated the state's violation of Lindsey's due process right to have material favorable evidence, including impeachment evidence, disclosed to him. On direct examination, the prosecutor asked Pate, "Have you been promised anything in return for your testimony here today?" Pate responded, "No, sir." (R.p. 211). Even more to the point, Pate responded to Lindsey's attorney on cross examination as follows:
Q: Okay. Do you expect any kind of favorable consideration from the District Attorney's Office for coming to testify today?
A: If I wasn't offered anything how can I expect anything?
Q: Oh, okay. You don't expect any kind of favorable treatment?

A: No. (R.p. 224) (emphasis added).
At either point in the trial, the prosecutor could have requested permission to approach *627 the bench and disclosed to the trial court and defense counsel, as he later did at the hearing on the motion for new trial, that he had indeed promised to take Pate's testimony into consideration when the time for plea bargaining came. The natural effect of the state's failure to disclose this information was to mislead the defense into believing that Pate testified without any inducement.
The Sixth Amendment of the U.S. Constitution guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him." Confrontation means more than being allowed to confront the witness physically; it also means being allowed to cross-examine the witness. Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Through cross-examination, the defense is afforded the opportunity to reveal possible biases, prejudices, or ulterior motives of the witness. Indeed, the Supreme Court has explicitly recognized that "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." Davis, 415 U.S. at 316-17, 94 S.Ct. at 1110.
Even in cases where cross-examination has not been directly restricted, the Supreme Court has recognized that constitutional error may result from the "Government's failure to assist the defense by disclosing information that might have been helpful in conducting the cross-examination." Bagley, 473 U.S. at 678, 105 S.Ct. at 3381. In the instant case, the prosecutor's failure to disclose under Brady that he had promised to take Pate's testimony into consideration in future plea negotiations had a limiting effect on Lindsey's right to effectively cross-examine Pate. Lindsey had a constitutional right to attempt to show through cross-examination that the state's promise to take Pate's testimony into consideration created a justifiable expectation in Pate's mind that something favorable would happen if she testified against him, particularly if her testimony led to a conviction. Because the state failed to disclose, defense counsel was not able to make this point through vigorous cross-examination and was prevented from directly challenging the alleged disinterest of the prosecution's primary witness.
While admitting in his closing argument that he intended to give consideration to Pate, the prosecutor denied that Pate was aware of his intention. He repeatedly stated to the jury that she had not been promised anything by his office and had nothing to gain or lose. Thus, the jury was led to believe that Pate had no expectation that she would receive favorable consideration in exchange for her testimony:
We know that Debbie Pate has nothing. She told you herself, I have no deals with the District Attorney's Office, I've been subpoenaed down here, and I've been told that nothing I say can be used against me except for perjury or filing a false report. She has nothing to gain or lose, and I'd be honest with you. * * * * And I'm not going to sit here and tell you that that's not going to be taken into consideration and [sic] my recommendations to Mr. Bullers. I'm not going to try and snow you on that, but there's been nothing promised to her, nothing at all, either on the outcome, one way or the other of this trial. * * * * She has nothing to lose. She has nothingshe hopes she can gain something, but nothing's been promised to her and she has nothing to gain by saying specifically it was Glen Lindsey. (R.p. 286).
It is evident from this monologue that the prosecutor went beyond failing to disclose. He actually argued to the jury that he had never promised consideration to Pate; thus, any benefit she anticipated through her testimony was based upon a mere "hope" rather than a justifiable expectation.
In sum, the prosecutor, after discussing various possible plea agreements, admittedly promised to give consideration to Pate in return for her testimony and then failed to disclose this fact when Pate testified to the contrary. The state also failed to disclose *628 the actual agreement made with Pate subsequent to her testimony and while the jury was still deliberating. Had the defense been aware of this information, it could have attempted to impeach Pate's credibility or moved for a mistrial. Thus, we find that this information should have been disclosed to the defense under the requirements of Brady and La.C.Cr.P. art. 729.3.
The remaining question is whether there is a reasonable probability the evidence, if disclosed to the defense, would have changed the outcome of the trial or created a reasonable doubt not otherwise existing. Bagley, supra; State v. Knapper, 579 So.2d 956 (La.1991). A new trial is required if the false testimony could in any reasonable likelihood have affected the judgment of the jury. Giglio, supra. In formulating the rule to be followed in such instances, the Supreme Court has stated:
It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.
United States v. Agurs, 427 U.S. at 112-13, 96 S.Ct. at 2402.
In this instance, the state's case depended almost entirely upon the testimony of Pate; she was the only witness to place Lindsey at the scene of the crime. While a conviction may be based on the uncorroborated testimony of an alleged accomplice, such testimony should be treated with great caution. Holland, supra. In this case, Pate's testimony was directly contradicted by that of two defense witnesses who testified that Lindsey was at his apartment at the time the robbery took place. The only other evidence presented by the state was a tire tool found in the passenger compartment of Lindsey's girlfriend's car. However, there was absolutely no physical evidence linking the tire tool to the robbery.
Succinctly stated, without Pate's testimony, the state would not have had sufficient evidence to convict Lindsey. Pate's credibility as a witness was therefore paramount to the state's case. Evidence of any understanding between her and the state as to her future prosecution would be relevant to her credibility. Giglio, supra. We are convinced that had the jury known that Pate and the state entered into a deal before the trial was over and immediately after she gave testimony, emphatically denying she expected any favorable consideration, the jury might have more seriously questioned Pate's credibility. We specifically conclude from this record that there is a reasonable likelihood that the verdict would have been different had the jury been aware of Pate's expectation of favorable consideration and of the actual plea agreement entered after she testified but still during trial. The prosecutor's failure to disclose this information deprived Lindsey of the opportunity for a fair trial. He is therefore entitled to a new trial.

CONCLUSION
Accordingly, the conviction and sentence are reversed, and the matter is remanded for a new trial. It is unnecessary to consider Lindsey's excessive sentence claim.
REVERSED AND REMANDED.
SEXTON, J., dissents with written reasons.
SEXTON, Judge, dissenting.
Based on Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), progeny of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the majority would reverse here on a finding of a Brady violation.
The first case, Giglio, was very simple. A previous assistant U.S. attorney prosecuting the case had told the key government *629 witness that he would not be prosecuted if he testified. This fact was unknown to the assistant who succeeded to the case, was never disclosed to the defense, and was therefore not known by the jury.
In Bagley, from which the majority quotes at some length, the undercover agents had a signed document from the government promising financial reward if the government was satisfied with the results of their effort. Whether that effort had only to lead to arrest or necessitated convictions is not clear. Obviously, however, the inducement was offered by the government during the investigative phase of the case.
Particularly because Bagley spoke of the "possibility" of an award being held out and that reward not being disclosed to the defense or the jury, the majority finds comfort in that case.
Giglio and Bagley present significantly different factual circumstances from those of the instant case. Nothing happened in the instant case that does not happen in any prosecution in which there are multiple defendants with various levels of involvement. As in almost any case, the defense attorney for the witness Pate discussed the possibility of various pleas with the state. The state clearly made no promises and simply pointed out that the witness would be given consideration for truthful testimony. Both the assistant district attorney and Pate's attorney later so testified and the trial court so found. For this reason, I have difficulty in understanding the majority's apparent determination that part of the prosecutor's closing argument (which is quoted in the majority opinion) indicates the existence of a promise. While the prosecutor did argue that the witness had nothing to gain or lose, he candidly conceded that her testimony was "going to be taken into consideration." He further said there had been "nothing promised to her" but pointed out "she hopes she can gain something."
Of course the witness hoped to receive consideration. That's obvious and apparent in any case in which any codefendant who has not been convicted testifies against another codefendant. Simple common sense makes it implicit in the circumstances.
Importantly, the defense counsel argued to the jury the numerous asserted inconsistencies in Mrs. Pate's testimony and all that she had to benefit from her testimony against this defendant, since she was the only person that the victim could identify. He pointed out that she told the court she didn't expect favorable treatment, but that "[t]he district attorney acknowledges, well, she probably does expect something...."
It seems to me the record indicates that the defense was aware of the actual situation, had an opportunity to cross-examine the witness about it, and argued it to the jury. I would not hold that the state has to inform the defendant of the obvious and thus would not extend Brady and its progeny to the instant circumstances.
I respectfully dissent.

APPLICATION FOR REHEARING
Before MARVIN, SEXTON, NORRIS, STEWART and WILLIAMS, JJ.
Rehearing Denied.
NOTES
[1] Lindsey's girlfriend is variously referred to throughout the record as Becky, Rebecca, Becky Pageant, and Rebecca McDougal. In the interest of clarity, we shall use her most frequent designation, Becky Pageant.
[2] While the bill of information was amended to include Scott Blevins, at the time of trial, his whereabouts were unknown.
[3] The state stipulated that neither Pate's trial testimony, nor evidence later uncovered as a result of her testimony, could be used against her except in subsequent proceedings for perjury or for filing a false report. (R.p. 210).
[4] Based on La.C.Cr.P. art. 765, which sets out the normal order of trial, trial continues until the discharge of the jury.
[5] He stated this in spite of the victim's testimony that Pate directed the robbery, giving orders as to what items should be taken and whether the victim should be killed.