780 So.2d 1213 (2001)
STATE of Louisiana, Appellee,
v.
Arthur R. ROBINSON, Appellant.
No. 34,383-KA.
Court of Appeal of Louisiana, Second Circuit.
February 28, 2001.
Rehearing Denied March 29, 2001.
*1215 Peggy J. Sullivan, Louisiana Appellate Project, Monroe, LA, Counsel for Appellant.
Richard Ieyoub, Attorney General, Paul Carmouche, District Attorney, Laura O. Wingate, Tommy Jan Johnson, Assistant District Attorneys, Counsel for Appellee.
Before BROWN, GASKINS and KOSTELKA, JJ.
BROWN, J.,
Defendant, Arthur R. Robinson, was convicted of two counts of second degree kidnapping. As to count one, he was sentenced to 15 years imprisonment at hard labor, two years of which were to be without benefit. As to count two, defendant was adjudicated a fourth felony offender and sentenced to life imprisonment. The sentences were ordered to be served concurrently. Defendant appeals his convictions and sentences. The victim in count one refused to testify and for the reasons set forth below, we are constrained to reverse defendant's conviction and sentence as to count one (kidnapping of Ira Goodin); however, we affirm his conviction and sentence on count two (kidnapping of Davin Murff).

Facts
The events leading up to the instant charges started with the shooting of defendant's brother, John Robinson, on November 19, 1996. On that evening, Shreveport Police Officer Thomas A. Reich responded to a report of a shooting at the 1600 block of Acorn Street. The victim was John Robinson, defendant's brother. Officer Reich recalled seeing defendant and Leslie Edward Autrey, a co-defendant, at the scene. Defendant identified himself to the officer as the victim's brother. Officer Reich transported two witnesses, Ira Goodin[1] and Roy Youngblood, to the police station for questioning and later, around 2:30 a.m., dropped them off, at their request, at the intersection of East Dalzell Street and Roosevelt Drive.
Leslie Autrey had arrived at John Robinson's house shortly after Robinson was shot; he and defendant decided to locate and question possible witnesses to the shooting. Ira Goodin and Davin Murff were the first two persons sought by defendant and Autrey. Defendant and Autrey left in defendant's Lincoln Town Car to look for Goodin and Murff. An axe handle and a 44 caliber handgun owned by defendant were in the car.
After about ten minutes, they came across Davin Murff. Defendant and Autrey approached Murff on a street corner to "question" him about John Robinson's shooting. Murff testified that he knew or was familiar with both defendant and his brother John. Defendant asked Murff if he knew anything about his brother's shooting. Murff replied that he knew nothing.[2] Defendant countered that the boy did in fact know something. Despite Murff's continued protests, defendant pulled a "big ole gun" and pointed it at him. Defendant *1216 then struck Murff on the side of the head with the gun, causing the weapon to discharge and Murff to fall to his knees. The trauma from the blow caused Murff's head to bleed.
Defendant and Autrey then forced Murff into the car and Autrey drove them to defendant's mother's house on Galloway Street. It was there that Murff was tied up with coat hangers then put into the trunk of the car and taken to an abandoned warehouse near Texas Street. Murff was placed in a room and tied to a pole with rope. Defendant and Autrey left Murff bound up in the warehouse. Murff denied seeing the other victim, Ira Goodin, in the warehouse.[3]
Defendant and Autrey then left the warehouse to look for Goodin. Autrey estimated that he and defendant had known Goodin for 25 years. They found Goodin on a street corner with Roy Youngblood. Either defendant and/or Autrey got out of the car and went up to Goodin. Defendant asked Goodin to get into the car. Goodin began "talking trash" and at that point defendant ordered him into the vehicle.
Goodin got in the back seat of the Town Car. According to Autrey, Goodin got in voluntarily and neither he nor defendant held a gun on Goodin. They drove to the warehouse on Texas Street. During the drive, Goodin repeatedly denied knowing anything about the shooting of defendant's brother. At the warehouse, they drove inside the building and got Goodin out of the car. Autrey couldn't recall whether defendant held a gun on Goodin in the warehouse. Over defense counsel's objections, Autrey asserted at trial that Goodin "must have known" that defendant had a gun.
Goodin was tied up at some point after he got out of the car at the warehouse. According to Autrey, Goodin was "happy to be tied up" and "didn't try to argue at all." Defendant and Autrey then drove off to look for more "witnesses."
About two hours later, Officer Reich encountered Goodin at the police station. Goodin, who appeared to be real excited or nervous, reported that he and another person (Murff) had been kidnapped and held at a nearby warehouse. While he was able to escape, the other victim was still in the building. Officer Reich, accompanied by Goodin, went to the warehouse. Goodin related that the kidnappers were driving a Lincoln.
En route to the building, Officer Reich observed a car matching the description of the Lincoln about a block from the building where Goodin said that he had been held. At Officer Reich's request, the Lincoln was stopped by a nearby K-9 unit. Defendant, who was driving, and Autrey were the only occupants of the vehicle. They were directed to get out of the car. Officer Reich asked Goodin whether he recognized either of the men; Goodin identified Autrey as one of his captors. Goodin, however, told Detective Ronnie Grider that defendant "had nothing to do with it." According to Officer Reich, Goodin was either unable or unwilling to identify defendant.
A patdown of Autrey revealed a pager. Since it was not a weapon, the beeper was not seized; however, it was later found in the police car and identified as the property of Murff. A Red Hawk 44-caliber revolver and an axe handle were found in the car on the passenger side. Also found in the car were a couple of knives, a roll of duct tape, and, in the trunk, some hangers.
Defendant and Autrey were read their Miranda rights and detained at that time.
Officer Reich, Goodin and several other officers continued to the building, a vacant warehouse, at 1924 Texas Street. Goodin showed the officers the room in which he had been held. Rope, coat hangers and duct tape were found in the room. Murff was found tied up in another room and was released by the officers.
*1217 At trial, Murff identified defendant and Autrey as his kidnappers. Murff admitted that when initially questioned by the police, he told them that he could only identify Autrey. He told the authorities that he had been blindfolded and could only see the second kidnapper's work boots. At trial, Murff explained that he knew defendant and did not give his name to the officers because he was scared of him.
Roy Youngblood confirmed that he and Goodin were transported to the police station for questioning about John Robinson's shooting then released early the next morning. After they were dropped off, Youngblood and Goodin began to talk. During their conversation, defendant and Autrey drove up in a Lincoln Continental. Youngblood could not tell who was driving until he walked up to the car. He recalled that defendant, whom he had known all of his life, was driving and Autrey was in the front passenger seat. According to Youngblood, Autrey got out of the car and began talking to Goodin; upon Autrey's request, Goodin got into the car. Autrey got back into the vehicle and they drove off.
On cross-examination, Youngblood testified that he had been arrested as a material witness in this case. Youngblood further acknowledged that he had earlier told defense counsel that it was dark and he could not see who was driving the car. He explained, however, that he could not initially identify the driver but when he walked up to the vehicle he was able to recognize defendant. Youngblood stated that he did not see a weapon.
Detective Ronnie Grider testified that he handled the investigation into the shooting of John Robinson. Det. Grider interviewed Goodin and Youngblood because they were reportedly nearby and were potential witnesses. After completion of the interviews, Det. Grider went home. He was called out later in response to a report that one of the witnesses had been kidnapped. Det. Grider interviewed Goodin and Murff. At that time, Murff identified Autrey as one of his kidnappers, but said that he could not identify the other one because he was blindfolded and could only see his work boots, which were similar to the ones that defendant wore that night.
At trial, however, Murff testified that he was not blindfolded, but could see that the other kidnapper was in fact defendant. Murff stated that he lied to the police initially because he was afraid of defendant.
When Goodin was interviewed, he referred to defendant as "Arthur" and stated that Arthur was not involved in the kidnapping. Goodin did identify Autrey as one of the kidnappers and said that he didn't know the other kidnapper. Det. Grider interviewed Autrey, who said that he did not do anything. At that point, the interview ended because Autrey requested an attorney.
Autrey testified at defendant's trial. His attorney, Pamela Smart, was present. She confirmed that she had counseled Autrey regarding his right not to testify and stated that it was Autrey's decision to take the stand. Ms. Smart remained in the courtroom during her client's testimony.
Autrey affirmed that he was waiving his constitutional rights and was testifying because he wanted to "go on and get it over with" so he might "come out with a lesser sentence." Autrey also pointed out that he needed an operation. He acknowledged engaging in plea discussions with the district attorney's office, but emphasized that there was no agreement as of trial.
As to the events surrounding the kidnappings, Autrey testified that he agreed to help defendant find Goodin and "the youngster"[4] to question them about John Robinson's shooting. They rode in defendant's Lincoln. According to Autrey, both *1218 the .44 Magnum and the axe handle belonged to defendant. About three blocks from Acorn Street, they saw Murff. Defendant grabbed Murff and hit him with the gun. Autrey and defendant then put Murff in the car. They drove to defendant's mother's house on Galloway Street where defendant tied Murff up with some clothes hangers and placed him in the trunk of the car. From there defendant and Autrey drove Murff to an old building on Texas Street. Defendant unlocked an overhead door and drove the car into the building. Murff was placed in a room in which he was tied to a post. When questioned, Murff denied any knowledge about the shooting.
Defendant and Autrey left and drove to Stoner Hill to find Goodin. The pair found Goodin talking to Roy Youngblood. Defendant told Youngblood to "go on," because they wanted to talk to Goodin. Defendant questioned Goodin, who began "talking trash." Goodin denied knowing anything about the shooting. At the warehouse, Goodin did not resist being tied up, possibly because he knew that defendant was armed.
Defendant and Autrey left to locate more witnesses and as they drove back to the warehouse, they were stopped by the police and arrested. Goodin was in the back seat of the patrol car that pulled in behind the Lincoln. Obviously, since defendant and Autrey were arrested at that time, Goodin identified them as his kidnappers.
At trial, Autrey testified that he had previously been convicted of bank robbery, escape, simple burglary, aggravated assault, DWI, possession of cocaine, theft and shoplifting. Autrey also acknowledged that until a week before defendant's trial, he had consistently denied any complicity in the kidnappings of Goodin and Murff.
The other victim, Ira Goodin, was called to the stand by the state. Goodin refused to testify, asserting his Fifth Amendment privilege against self-incrimination. The jury was removed and again Goodin refused to testify. At that point, the state announced that it did not intend to persist in questioning Goodin as a witness. Counsel was appointed for Goodin.
Goodin was also called by the defense. Again, he refused to testify, asserting his Fifth Amendment privilege. The jury was excused and Goodin continued to plead the Fifth based upon his counsel's advice. The defense then rested. After deliberations, the jury found defendant guilty on both counts.

Discussion

Sufficiency of the Evidence
The proper standard of review under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Bosley, 29,253 (La.App. 2d Cir.04/02/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333; State v. Bellamy, 599 So.2d 326 (La.App. 2d Cir.1992), writ denied, 605 So.2d 1089 (La.1992). The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of the evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Owens, 30,903 (La.App. 2d Cir.09/25/98), 719 So.2d 610, writ denied, 98-2723 (La.02/05/99), 737 So.2d 747.
This court's authority to review questions of fact in a criminal case is limited to the sufficiency-of-the-evidence evaluation under Jackson v. Virginia, supra, *1219 and does not extend to credibility determinations made by the trier of fact. La. Const. Art. 5, § 10(B); State v. Williams, 448 So.2d 753 (La.App. 2d Cir.1984). A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Bosley, supra. In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. White, 28,095 (La.App.2d Cir.05/08/96), 674 So.2d 1018, writ denied, 96-1459 (La.11/15/96), 682 So.2d 760, writ denied, 98-0282 (La.06/26/98), 719 So.2d 1048.
La.R.S. 14:44.1(A) defines second degree kidnapping as the doing of any acts listed in Subsection B wherein the victim is:
(3) physically injured or sexually abused;
(5) imprisoned or kidnapped when the offender is armed with a dangerous weapon or leads the victim to reasonably believe that he is armed with a dangerous weapon.
(B) For purposes of this Section, kidnapping is:
(1) the forcible seizing and carrying of any person from one place to another;... or
(3) the imprisoning or forcible secreting of any person.

Count One: Kidnapping of Ira Goodin
The facts of the Goodin kidnapping raise a most unusual question: whether the state can obtain conviction of a defendant when, at trial, the victim asserts his Fifth Amendment privilege against self-incrimination and refuses to testify at all about the alleged crime.
Apparently neither the state nor defense counsel knew of this problem when the trial started. Although the prosecutor did not object, the trial court should not have allowed Goodin to make a general or blanket assertion of his Fifth Amendment privilege at defendant's trial, inasmuch as Goodin was a victim, not a suspect, in his own kidnapping. There was clearly no danger of Goodin incriminating himself in his own abduction. Instead, the questions posed to Goodin should have been monitored by the trial court to limit the inquiries to the kidnapping incident. This would have avoided any improper questioning into the shooting of John Robinson, a crime for which Goodin contended he was a suspect.
The only non-hearsay evidence of Goodin's kidnapping was that of the co-defendant, Leslie Autrey. Autrey, however, also testified that Goodin got into the car voluntarily and that no weapon was threatened or used.
In State v. Brown, 236 La. 562, 108 So.2d 233 (1959), the supreme court outlined the rule of law regarding corpus delicti:
In the trial of every criminal case the State, to warrant a legal conviction of an accused, must prove the corpus delicti, or the fact that a crime has been committed. Without such proof no conviction will be permitted to stand. Suspicion, rumor, gossip, or mere hearsay evidence is not sufficient to establish the proof of corpus delicti, ...
State v. Brown, 108 So.2d at 236.
As noted by the supreme court in State v. Willie, 410 So.2d 1019, 1029 (La.1982):
It is well settled that an accused party cannot be legally convicted on his own uncorroborated confession without proof that a crime has been committed by someone; in other words, without proof of the corpus delicti. State v. Ashley, 354 So.2d 528 (La.1978); State v. Mullins, 353 So.2d 243 (La.1977); State v. Freetime, 334 So.2d 207 (La.1976); State v. Sellers, 292 So.2d 222 (La.1974); State v. Brown, 236 La. 562, 108 So.2d 233 (1959); State v. Calloway, 196 La. 496, 199 So. 403 (1940); State v. Morgan, 157 La. 962, 103 So. 278 (1925). The corpus delicti must be proven by evidence which the jury may reasonably accept as establishing that fact beyond a reasonable *1220 doubt. State v. Carson, 336 So.2d 844 (La.1976); State v. Brown, supra; State v. Morgan, supra.

It is also well established that hearsay cannot be the sole basis to establish the corpus delicti of a crime. In the case of State v. Whittington, 450 So.2d 47 (La. App. 3d Cir.1984), the defendant was stopped and found in his car were musical instruments stolen from a church. Defendant confessed that he had stolen the items from the church. At trial, the state did not produce any witness from the church, but adduced, without objection, hearsay evidence in which the investigating officer testified as to what the church's minister and a deputy had told him about the burglary. The Third Circuit reversed the conviction, citing State v. Brown, supra, and State v. Willie, supra, holding that:
Mere hearsay is insufficient to establish proof of the corpus delicti.... Since the testimony of both the Reverend and the deputy was based on hearsay, the State did not prove that a crime had been committed. Therefore, the confession, standing alone, is insufficient to sustain this conviction.
State v. Whittington, supra at 48.
The problem in the instant case is that Officers Reich and Grider each testified that Goodin told them that he was kidnapped by Autrey and an unknown party and that defendant, Arthur Ray Robinson, had nothing to do with his kidnapping.
Co-defendant Autrey testified that Goodin left with him and defendant voluntarily; that no weapon was used or threatened; and, most unusual, that Goodin appeared happy to be tied up.
We emphasize that the result in this case would be different had Goodin testified at trial or if the co-defendant, Autrey, had testified more positively. Without a positive statement that Goodin was forcibly seized or imprisoned, this conviction can not stand. The corpus delicti has not been shown.

Count Two: Kidnapping of Davin Murff
The evidence concerning the kidnapping of Davin Murff established that he was forcibly removed from the street and taken to a building where he was tied to a pole. His testimony at trial, together with the testimony of Autrey, establish that defendant participated in this kidnapping.
While it is true that Murff did not initially identify defendant as one of his kidnappers, he explained that he was afraid of defendant. There was no direct or indirect evidence to indicate that Murff had any reason to falsely accuse defendant. The record supports the jury's decision to accept Murff's explanation for his failure to identify defendant originally and defendant has offered no evidence or argument to justify overturning the jury's verdict on this count.

Denial of Post-Trial Motions for Judgment of Acquittal and New Trial
Defendant's post-judgment motion for acquittal is essentially an argument of sufficiency of the evidence. For the reasons stated above, the evidence was such that a rational trier of fact could have found defendant guilty as to count two, the kidnapping of Davin Murff. Inasmuch as we found that the evidence, however, was not sufficient as to count one, the kidnapping of Ira Goodin, this assignment of error is moot.
With respect to defendant's motion for new trial, it is based upon three grounds: the verdicts were contrary to the law and evidence; post-trial discovery of new and material evidence; and, the ends of justice support the granting of a motion for new trial.
The argument that the verdict is contrary to the law and evidence is not subject to appellate review except for error of law. Again, defendant does not cite an error of law but simply restates his sufficiency argument.
The new and material evidence consists primarily of Goodin's testimony and that of *1221 his attorney, Pamela Smart. Again, in light of our reversal as to count one, we will consider this testimony solely as it pertains to defendant's conviction on count two.

Ira Goodin's testimony
Although Ira Goodin refused to testify at trial, the majority of the hearsay statements adduced at trial are consistent with his subsequent testimony. Goodin knew both defendant and Autrey for years. He had been questioned by the police as a witness to the shooting of defendant's brother. Goodin got into defendant's car voluntarily. Defendant had nothing to do with Goodin's kidnapping. Instead, he was kidnapped by Autrey and an unknown man.
The main problem with this argument is that Goodin's testimony really has nothing to do with count two, Davin Murff's kidnapping. Murff's trial testimony, coupled with the testimony of the rescuing officers, clearly proves the elements of second degree kidnapping. Defendant approached Murff, hit him on the head with a large revolver, stuffed him into defendant's car and drove off with him. Murff clearly identified defendant and Autrey as his kidnappers.
What was new was Goodin's testimony that his exercise of his Fifth Amendment privilege was the product of fear of retaliation by Autrey's family; however, Goodin never had any trouble identifying to the police that Autrey was one of the perpetrators. Instead, Goodin readily identified Autrey as one of his captors. It was defendant that Goodin declined to identify.

Pamela Smart's Testimony
Ms. Smart, Autrey's attorney, testified at the motion for new trial hearing that she recalled that an agreement was reached with the state for her client to receive a reduced charge and a lesser sentence for testifying. Her testimony, however, was disputed by ADA Lockhard, who stated that no such deal was made. The state argues that if there was a deal, then Ms. Smart should have told the court when her client testified differently at the trial. We note that when asked whether the agreement was before Autrey testified, Ms. Smart responded, "I believe that's what it was, the best I can remember."[5]
Defendant cites State v. Lindsey, 621 So.2d 618 (La.App. 2d Cir.1993), writ denied, 629 So.2d 417 (La.1993), on subsequent appeal, 28,016 (La.App.2d Cir.04/03/96), 671 So.2d 1155, in which the prosecution failed to disclose a plea agreement with a witness.
We find State v. Lindsey to be inapplicable. The issue in that case was the failure to disclose that a witness had been promised favorable consideration in return for his testimony. In the instant case, the jury was informed that Autrey was expecting favorable consideration from the prosecutor. The jury was fully aware that Autrey's testimony could have been affected by a "deal" and made their assessment of his credibility in light of this knowledge. Even with Ms. Smart's testimony, which we note was uncertain as to when the plea discussions even occurred, there is no evidence that the jury would have reached a different verdict. We find no abuse of the trial court's discretion in its denial of these motions.

Fourth Felony Adjudication
Defendant asserts that there are defects with respect to two of the three predicate felony offenses alleged in the habitual offender bill of information. According to defendant, the proof is insufficient to show that he is the same person who was convicted of the first predicate offense, attempted forgery. Defendant further argues that the evidence for the third predicate offense, which is a guilty plea, does not show that defendant was represented by counsel at the time of the plea.
La.R.S. 15:529.1(D)(1) provides in pertinent part:
(b) Except as otherwise provided in this Subsection, the district attorney shall *1222 have the burden of proof beyond a reasonable doubt on any issue of fact. The presumption of regularity of judgment shall be sufficient to meet the original burden of proof. If the person claims that any conviction or adjudication of delinquency alleged is invalid, he shall file a written response to the information. A copy of the response shall be served upon the prosecutor. A person claiming that a conviction or adjudication of delinquency alleged in the information was obtained in violation of the Constitutions of Louisiana or of the United States shall set forth his claim, and the factual basis therefor, with particularity in his response to the information. The person shall have the burden of proof, by a preponderance of the evidence, on any issue of fact raised by the response. Any challenge to a previous conviction or adjudication of delinquency which is not made before sentence is imposed may not thereafter be raised to attack the sentence. (Emphasis added).
In this case, defendant filed a motion to quash the third predicate offense for Boykin reasons, including that the record failed to show that he was represented by counsel at his guilty plea, and then generally stated that he "denies that he is the defendant in any of the prior convictions alleged in the Bill and requires the State to prove beyond a reasonable doubt his identity."
The three predicate offenses alleged in the instant case consisted of a guilty verdict on a charge of attempted forgery in state court in Caddo Parish, Louisiana; a guilty plea to federal charges of distribution of heroin and possession of heroin with intent to distribute in the U.S. District Court for the Western District of Louisiana; and, a guilty plea to a federal charge of conveying a weapon within a federal penitentiary in the U.S. District Court for Kansas. These offenses will be discussed separately.

Attempted Forgery Conviction-1973
To obtain a multiple offender conviction, the state is required to establish both the prior felony conviction(s) and that the defendant is the same person convicted of the offense(s). Various methods are available to prove that the defendant on trial is the same person convicted of each prior felony offense, such as the testimony of witnesses, expert opinion as to the fingerprints of the accused when compared with those of the person previously convicted, photographs contained in a duly authenticated record, or evidence of identical driver's license number, sex, race and date of birth. State v. Westbrook, 392 So.2d 1043 (La.1980); State v. Jackson, 31,433 (La.App.2d Cir.01/20/99), 726 So.2d 1061, writ denied, 99-2250 (La.12/17/99), 751 So.2d 876. The mere fact that the defendant on trial and the person previously convicted have the same name does not constitute sufficient evidence of identity. State v. Curtis, 338 So.2d 662 (La. 1976); State v. Jackson, supra.
In order to prove the first predicate offense, the state offered three exhibits. S-1 is an arrest sheet from the Shreveport Police Department of Arthur Ray Robinson on suspicion of forgery dated August 31, 1973. It contains a fingerprint. S-2 is a fingerprint taken of the defendant in the courtroom during the habitual offender hearing. A fingerprint expert matched defendant's fingerprint on S-2 to the fingerprint contained in S-1.
S-3 contains numerous documents admitted in globo. All but one of the documents pertain to docket number 95,257; a bill of information filed September 11, 1973, charging Arthur Ray Robinson with a July 28, 1973 forgery; pretrial discovery documents; a jury charging sheet; and a jury verdict form finding Arthur Ray Robinson guilty of attempted forgery. The documents in S-3 establish that Arthur Ray Robinson, who was represented by counsel, was convicted by a jury of attempted forgery. The one document in S-3 that does not contain a docket number is a sheriffs report for booking Arthur Ray Robinson into the parish jail. Personal identifiers of age, sex, race, birth date and a local address on that document match those on the arrest sheet, S-1.
*1223 The crime occurred on July 28, 1973. The two booking documents show that defendant was arrested on August 31, 1973, by the city police and booked into their jail for forgery and that he was transferred to the sheriff's custody on September 3, 1973, on the charge of forgery. A bill of information against Arthur Ray Robinson charging forgery was filed on September 11, 1973. On January 8, 1974, Arthur Ray Robinson was convicted, by a jury, of attempted forgery. It was not until several years later that a defendant's fingerprints were required to be affixed to the bill of information/indictment upon conviction.
The trial court determined that the state carried its burden and presented sufficient information to show that defendant was the man convicted of attempted forgery. Defendant chose to rest on the state's ability or inability to prove its case and offered no affirmative statement or documents to contradict the reasonable inferences from the evidence. We do not find that the trial court was clearly wrong in its factual decision and thus, this conviction is valid for habitual offender purposes.

Federal Heroin Conviction-1978
As to this conviction, the state introduced S-4, the minutes of the federal conviction of Arthur Ray Robinson, together with the testimony of his federal probation officer, who identified defendant as the same Arthur Ray Robinson. In fact, defendant does not contest the use of this conviction for habitual offender purposes.

Federal Weapons Charge-1979
The same federal probation officer identified defendant as the Arthur Ray Robinson convicted on this charge. Defendant argues that the record of that conviction does not show that he had counsel present when he pled guilty.
The 1979 minute entry for docket number XX-XXXXX-XX in the United States District Court for the District of Kansas reads:
10-Jan. 8 Change of plea: At Topeka,
 Rogers-J: Deft. enters plea
 of G. & submits waiver of
 PSI report.
However, the minutes also show that in 1978:
5-Dec. 6 Financial affidavit, Order
 appointing FPD (federal
 public defender) as counsel
 & release order
That court record lists David J. Phillips as the public defender representing defendant. Further, A Judgment and Probation/Commitment Order signed by U.S. District Judge Richard D. Rogers states that Arthur Ray Robinson appeared in person on January 8, 1979 in docket number XX-XXXXX-XX with counsel, David J. Phillips, Assistant Federal Public Defender and pled guilty to the indictment for conveying a weapon within the U.S. Penitentiary at Leavenworth, Kansas, and was sentenced to one year and one day consecutive to any present sentences.
In State v. Shelton, 621 So.2d 769 (1993), our supreme court, in light of Parke v. Raley, 506 U.S. 20, 113 S.Ct. 517, 121 L.Ed.2d 391(1992), revised the previous scheme allocating burdens of proof in habitual offender proceedings to properly reflect the "presumption of regularity of judgments." The court wrote:
In light of the fact that Parke holds Boykin does not require that the entire burden be placed on the prosecution in a recidivism proceeding and because our present system of placing the entire burden on the State fails to give any presumption of regularity to a final conviction used in an habitual offender hearing, we today revise our previous scheme allocating burdens of proof in habitual offender proceedings.
If the defendant denies the allegations of the bill of information, the burden is on the State to prove the existence of the prior guilty pleas and that defendant was represented by counsel when they were taken. If the State meets this burden, the defendant has the burden to produce some affirmative evidence showing an infringement of his rights or a procedural irregularity in the taking of the plea. If the defendant is able to do *1224 this, then the burden of proving the constitutionality of the plea shifts to the State. The State will meet its burden of proof if it introduces a "perfect" transcript of the taking of the guilty plea, one which reflects a colloquy between judge and defendant wherein the defendant was informed of and specifically waived his right to trial by jury, his privilege against self incrimination, and his right to confront his accusers. If the State introduces anything less than a "perfect" transcript, for example, a guilty plea form, a minute entry, an "imperfect" transcript, or any combination thereof, the judge then must weigh the evidence submitted by the defendant and by the State to determine whether the State has met its burden of proving that defendant's prior guilty plea was informed and voluntary, and made with an articulated waiver of the three Boykin rights. We note that this new procedure will not only give appropriate significance to the presumption of regularity which attaches to judgments of conviction which have become final, but will also provide an advantage to defendants who were previously under [State v.] Lewis [367 So.2d 1155 (1979)] unable to introduce any extra-record evidence and whose guilty pleas were heretofore under [State v.] Tucker [405 So.2d 506 (1981) ] found constitutionally valid by mere proof of a minute entry and a guilty plea form.
State v. Shelton, supra, at 779-780 (footnotes omitted).
The record in this case shows that defendant was represented by counsel at the time of his plea. Defendant made no affirmative showing that this was not the case. This conviction was properly used in the habitual offender proceeding.[6]

Excessiveness of Sentence
Defendant acknowledges the trial court's wide discretion to sentence within statutory limits, but contends that the sentences were harsh and excessive, particularly in light of Goodin's testimony that defendant was not one of his kidnappers.
As found previously, we reverse defendant's conviction and sentence as to count one. As to count two, the court considered defendant's criminal history and that the crime created a risk of great bodily harm to the victim. Even so, where there is a constitutional mandatory sentence, there is no need for the trial court to justify a sentence that it is legally required to impose. State v. Koon, 31,177 (La.App.2d Cir.02/24/99), 730 So.2d 503.

Conclusion
For the reasons set forth above, defendant's conviction and sentence as to count one are REVERSED. Defendant's conviction and sentence as to count two are AFFIRMED.
APPLICATION FOR REHEARING
Before BROWN, WILLIAMS, GASKINS, PEATROSS, and KOSTELKA, JJ.
Rehearing denied.
NOTES
[1] Ira Goodin is often referred to by others as "R.D." or "R.D. Goodin." In other parts of the record his name is spelled "Gooden."
[2] At trial, Murff testified that he was nowhere around when John Robinson was shot. According to Murff, he was on a pay phone at the Mr. Jim's Chicken on the corner of Youree Drive and Olive Street when he heard a shot. He then took off running to "get out of Dodge... get out of the streets." When he saw the police cruisers respond to Acorn Street, however, he went to the scene "just to be nosy." Murff testified that he wasn't even questioned by the police as a witness to the shooting.
[3] Murff again denied any knowledge of John Robinson's shooting. According to Murff, he was simply "in the wrong place at the wrong time."
[4] Autrey did not know Murff's name. Throughout his testimony, Autrey referred to Murff as "the youngster" or the kid he had seen running away from the scene of the shooting.
[5] Autrey received only an 18-month sentence.
[6] The holdings in State v. Stewart, 27,049 (La. App.2d Cir.05/10/95), 656 So.2d 677, writ denied, 95-1764 (La.12/08/95), 664 So.2d 420, after remand, 29,241 (La.App. 2 Cir.02/26/97), 712 So.2d 106, relied upon by defendant, should be relegated to their specific facts.