872 So.2d 552 (2004)
STATE of Louisiana
v.
Theodore GENTER.
No. 2003-KA-1987.
Court of Appeal of Louisiana, Fourth Circuit.
April 7, 2004.
*553 Eddie J. Jordan, Jr., District Attorney, Nick Orechwa, Assistant District Attorney, New Orleans, LA, for Plaintiff/Appellee.
Laura Pavy, Louisiana Appellate Project, New Orleans, LA, for Defendant/Appellant.
(Court Composed of Judge CHARLES R. JONES, Judge MAX N. TOBIAS, JR., and Judge Pro Tempore MOON LANDRIEU).
MAX N. TOBIAS, JR., Judge.
On 21 February 2002, the defendant, Theodore Genter ("Genter"), was indicted for the second degree murder of Caryn Beth Capps a/k/a Lydia Reinstein, a violation of La. R.S. 14:30.1.[1] On 8 March 2002, he pled not guilty to this charge. The court heard his motion to suppress the statement on 24 May 2002 and denied it on 14 January 2003. On 6 June 2003, at the conclusion of a four-day trial, a twelve-person jury found Genter guilty as charged. On 22 August 2003, the trial court denied Genter's motions for judgment of acquittal and in arrest of judgment. Genter waived all delays, and the court sentenced him to life imprisonment at hard labor without benefits of parole, probation, or suspension of sentence. On that same date, the court denied Genter's motion to reconsider sentence but granted his motion for appeal.
In December 2001 police officers in Mandeville, Louisiana were investigating a crime that occurred in that area. During this investigation they contacted Christopher Kuddes ("Kuddes"), a suspect in the crime. When giving his statement, Kuddes stated that Genter, who was also a suspect in the Mandeville crime, had earlier bragged about killing a woman named Lydia while in New Orleans. Kuddes told the police that Genter's former roommate, William Morhaus ("Morhaus"), was also involved in the murder. The officers discovered Morhaus had been involved in another altercation on the North shore. The officers picked up Morhaus from his apartment on South Robertson Street in New Orleans and took him back to Mandeville where they interviewed him. During this interview, Morhaus admitted that he and Genter killed a woman he only knew as Lydia and disposed of her body in a dumpster. The officers contacted N.O.P.D. officers, and they questioned Morhaus, who gave a statement implicating himself and Genter in Lydia's murder.
Detective Winston Detective Harbin ("Detective Harbin") testified that on 11 December 2001 he was instructed to go to an apartment at 5832 South Robertson Street in New Orleans. When he arrived, he remembered that he had been called to the same address in March 2001 to investigate the death of Sara Ruffner, which was later ruled to be a suicide. Ms. Ruffner's roommate at the time of her death was Morhaus. Detective Harbin stated that he then received a call from the Mandeville police concerning the alleged murder at that address. He testified that he went to *554 the Mandeville police station and met with detectives. He testified that he viewed Morhaus' videotaped statement, and then spoke with Morhaus, who was at the police station. Detective Harbin testified that he advised Morhaus that he was under investigation for a possible homicide, and Morhaus agreed to accompany Detective Harbin back to New Orleans for questioning. Detective Harbin stated that he advised Morhaus of his rights when they were in the car traveling back to New Orleans, and during the drive he attempted to ascertain Lydia's identity. Morhaus could only tell him that Lydia was from Texas. Once they arrived at the Second District police station in New Orleans, Detective Harbin again advised Morhaus of his rights. Morhaus waived his rights and admitted that the statements he had made on the videotape in Mandeville were true. Morhaus also gave Detective Harbin Lydia's Yahoo e-mail address, and Detective Harbin testified that a search of the website came up with the name Lydia Reinstein. Detective Harbin testified that Morhaus told him that the murder occurred early in the morning on a date in late August 2001, and using a calendar Morhaus pinpointed the murder date as 29 August 2001.
Detective Harbin testified that Morhaus told him that Lydia was living in the South Robertson Street apartment with him and Genter. Morhaus told him that when he came home one night, Genter told him that he was going to kill Lydia, who was asleep in another room, and Morhaus was going to help him. Morhaus stated that he tried unsuccessfully to talk Genter out of killing Lydia. Morhaus stated Genter put a pillow over Lydia's face while he held her legs down until she stopped struggling. Morhaus told Detective Harbin that he and Genter then put Lydia's body in garbage bags, along with the pillow used to smother her and the blanket upon which she had been lying, and placed the bags in a lawn chair and carried the chair to the nearby dumpster at Ursuline Academy, where they dumped the body.
Detective Harbin testified that he then obtained a search warrant for the apartment and searched it on 13 December 2001. He testified that the officers seized various pieces of linen from the room where Morhaus indicated that Lydia had been killed, as well as linens and towels from Morhaus' bedroom and Genter's former bedroom, and some clothing. The officers seized various photographs of different females hoping that one of them was of Lydia. They seized various bills and mailings in Genter's name, in Morhaus' name, and in Sara Ruffner's name, all addressed to the South Robertson Street apartment. They seized various notebooks from Morhaus' bedroom. In addition, the officers seized a note to Morhaus from Genter wherein Genter acknowledged he owed Morhaus a sum of money for rent, but he could not pay and was moving out, leaving his furniture and television to Morhaus. In the note, Genter indicated that he was moving to the North shore with "Chris and Jackie."
Detective Harbin testified that after searching the apartment, he went to Mandeville on 14 December 2001 to interview Genter. He testified that he advised Genter of his rights, which Genter waived. He testified that Genter gave a statement wherein he denied all knowledge of Lydia's death. At some point, an attorney appointed to represent Genter in connection with the Mandeville charges appeared and spoke with him. The attorney advised Genter of his rights, and after speaking with the attorney Genter informed Detective Harbin that he was again waiving his rights. The attorney left. Detective Harbin testified that when he was out of the room after the attorney left, Detective Vincent Liberto ("Detective Liberto") of the *555 Mandeville police asked if he could question Genter. Detective Harbin assented to this request, and Detective Liberto interviewed Genter. During this questioning, Genter confessed to being involved in the disposal of Lydia's body, but he never admitted that he killed her. Detective Harbin testified that he then re-entered the room and advised Genter again of his rights. Genter again waived his rights, and Detective Harbin questioned him further, with Genter writing his answers on a notepad. Genter also identified the woman on the website as Lydia.
Detective Harbin testified that he obtained another search warrant for the apartment to look for any documentation in the name of Lydia Reinstein. Pursuant to this warrant, on 23 January 2002 he seized mattress covers as well as clothing from the bedroom that had been Genter's room. Detective Harbin testified that by this time Morhaus' parents had removed most of his belongings from the apartment, and no one else was living there at that time.
Detective Harbin testified that he also contacted the police in Dallas, Texas, inquiring about Lydia Reinstein. In response, officers there e-mailed him a photograph of Caryn Capps, whom they indicated had been the victim in an assault involving her ex-boyfriend Justin Reinstein. Detective Harbin testified that he showed the photograph to Morhaus, who identified her as Lydia. Detective Harbin stated he subsequently contacted Caryn Capps' mother in Texas, and she sent him photographs of Caryn, as well as an envelope from the last card she received from her daughter. Although the envelope had an Oklahoma return address, the envelope was postmarked 1 May 2001 from New Orleans. Detective Harbin testified that Capps' mother also sent clothing and hair samples for comparison with hair samples seized from the apartment, but no DNA testing was conducted. He also indicated that there was no fingerprint evidence to link Lydia to Caryn Capps, but he noted that the police had never recovered Lydia's body, because they believed it to have been buried in a landfill.
The State played two videotapes of Genter's statement to Detective Harbin and Liberto. In the earlier statement, Genter told Detective Harbin that he was a former missionary with the Church of the Latter Day Saints and was an ordained minister. He described Lydia and indicated that she had begun living in the apartment while he was visiting with friends on the North shore. He stated that Lydia sometimes slept in his room because his room contained an extra bed. He stated that Lydia was trying to overcome her heroin addiction by buying methadone from an uptown New Orleans drug dealer who drove a red pickup truck. He indicated that Lydia worked at the Crow Bar on Decatur Street, where Morhaus met her. He stated that Lydia told him that she was from Texas, but could not return there because there were warrants for her arrest. He denied ever discussing killing Lydia with Morhaus. He admitted, however, that once Lydia was gone he might have told various people that she might be living in a cardboard box somewhere for all he knew. He admitted that he and Kuddes bragged about being contract killers, but he insisted they had made up these stories to give them prestige.
In the later statement, made after he had spoken with the St. Tammany Parish public defender, Genter indicated that he was living with Morhaus in the apartment on South Robertson Street at the time of Lydia's death. He stated that he had known Lydia for approximately five days, and had become sexually intimate with *556 her. He indicated Morhaus was also intimate with her; however, both men wanted her to leave. He stated that earlier on the day of her murder he had accompanied Lydia to the French Quarter; she was going to work as a stripper, and he was going to apply for jobs at various hotels. He insisted that was the last time he saw her alive. He stated that later he went to a shopping mall in New Orleans East where he did maintenance work, and he arrived back at the apartment at approximately 1:30 a.m. the next morning. He stated Morhaus was there, but he did not see Lydia. He stated that he asked Morhaus where Lydia was, and Morhaus told him she had moved out of the apartment. Genter denied telling anyone that Lydia was probably living in a dumpster somewhere. He insisted that he did not know Lydia was dead.
The videotape showed that at some point Detective Harbin left the room, and Detective Liberto entered the room and began interviewing Genter. After speaking at some length, Genter admitted Lydia was dead. However, Genter insisted that he did not kill her. Genter stated that when he got home that night, Morhaus told him that he had "taken care" of the problems caused by Lydia. Genter stated Morhaus told him that he suffocated Lydia with a pillow and then put the pillow, the blanket, and Lydia's body into a series of garbage bags. Genter stated Morhaus had placed the garbage bags on his (Genter's) bed and had turned the air conditioning down in that room. Genter stated that he helped Morhaus dispose of Lydia's body because Morhaus told him that he (Genter) would be suspected of killing her because she was Genter's girlfriend. Genter testified Morhaus also implied Morhaus would kill Genter if he contacted the police. Genter stated that he and Morhaus changed into dark clothing, placed the bags with Lydia's body into a lawn chair, and walked the chair over to a dumpster at Ursuline Academy. He stated that they threw the bags with Lydia's body into the dumpster, left the chair next to the dumpster, and walked back home. Genter stated that he packed up Lydia's belongings and left them in a bag on the side of the street.
In his statement Genter said he eventually moved out of the apartment because he did not like the way Morhaus was treating him, and he was afraid of Morhaus. He indicated that Lydia was not the victim's real name, but rather Lydia was a name she used in the Goth culture. He stated that he once saw her Texas identification, but he could not remember the name on the card.
Captain Thomas Smegal testified that he investigated where the contents of the Ursuline Academy's dumpster (where Genter and Morhaus said the body was dumped) would have been taken around the time of the murder. He learned that the contents would have eventually been taken to a landfill in St. Charles Parish. He testified that he went to that landfill and ascertained the area where the contents were dumped in August 2001 had been completely compacted and covered with soil and vegetation. He testified that the area where the body would have been dumped was roughly a 300 square foot area, 30 feet deep, and the City did not have the resources to search the area.
The court qualified Joseph Tafaro, a criminalist for the N.O.P.D. crime lab, as an expert in forensic hair comparison. Mr. Tafaro explained how hair samples are compared and noted that close relatives could have an identical hair structure. He testified that he received a package of clothing from Caryn Capps' mother from which he was able to extract a few of Capps' hairs. He compared these hairs with hairs seized from the carpet underneath *557 the sofa in the South Robertson Street apartment; he testified that the microscopic characteristics were the same from both samples. He concluded that the two samples either came from the same person or from closely related people, but the two samples contained the same dye.
Doctor James Traylor testified that he conducted the autopsy on Sara Ruffner in March 2001. He indicated that while the toxicology report showed no alcohol, Ms. Ruffner had an anti-depressant and an anti-convulsant in her bloodstream. He testified that there was no indication that these drugs had been forcibly ingested, and Ms. Ruffner had left a suicide note. He testified that it was his opinion that Ms. Ruffner committed suicide.
Kuddes testified that he met Genter in Utah, and the two of them moved to New Orleans in early 2001. He stated that they first lived with Genter's uncle, and then they moved in with Morhaus, whom they had met at a showing of the Rocky Horror Picture Show at a theater in Covington. He testified that he moved from the apartment to Covington before Genter left the apartment, and he was not living there when Lydia moved in. He stated that he only met Lydia one timein Covington after a Saturday night showing of the Rocky Horror Picture Show, at that time Genter told him Lydia was his girlfriend. He described Lydia as a thin woman with dyed black hair. Kuddes testified that when he saw Morhaus and Genter the next Saturday night, Lydia was not with them. He stated that he asked Genter where she was, and Genter replied, "Oh, I killed her." Kuddes testified that Morhaus merely walked away when Genter made this statement, and Kuddes did not believe Genter, believing instead that Lydia merely left.
Kuddes testified that a few months later Genter left the apartment and moved in with him and his girlfriend. He stated that one day when his girlfriend was at work he asked Genter if he really killed Lydia, and if so, how he did it. He stated Genter admitted that he did kill her. He testified that Genter told him that Lydia was annoying both him and Morhaus, and one night while she was sleeping he and Morhaus discussed the matter and decided to kill her. Genter described how he put a pillow over Lydia's face and pinned her arms with his legs while Morhaus held her legs to keep her from moving. Genter then told Kuddes he and Morhaus wrapped Lydia in a blanket and threw her body in a dumpster. Kuddes testified that he did not contact the police after hearing this story because he still was not sure it was true. He testified that Genter lived with him and his girlfriend only two or three more weeks after Genter told him about the murder.
Kuddes admitted that he had prior convictions for aggravated battery and public lewdness, and he further admitted that he was a runaway and used drugs as a juvenile. In addition, he had been arrested, but never prosecuted, for check fraud. He also admitted that he and Genter told people they were brothers, and they started and perpetuated a rumor that they were serial killers.
Marisa Overheu ("Overheu") testified that she met Genter in July 2001 at a showing of the Rocky Horror Picture Show in Covington, and they began dating. She testified that she only saw Lydia on 26 August 2001, when she saw her with Genter after the show. Overheu stated that she was never introduced to Lydia, and she thought Lydia was Morhaus' girlfriend, even though she was spending more time with Genter. Overheu testified that the next Saturday night, she saw Genter and Morhaus in Covington, but Lydia was not there. She stated Genter asked her if she was mad, and when she asked about Lydia, *558 Genter told her, "She's not here anymore... I killed her." When Overheu said she did not believe him, Genter told her that he and Morhaus decided to get rid of Lydia because they were tired of her bringing drugs and drug dealers into the apartment. Overheu testified that Genter told her that he put a pillow over Lydia's face while Morhaus held her legs. Genter Instated that they wrapped her body in a blanket and dumped her in a dumpster at a nearby school, which Overheu identified as Ursuline Academy. Overheu testified that she was later shown the dumpster where the body had been placed.
Overheu testified that she was admitted to a mental hospital in Mandeville when she was sixteen years old and tried to kill herself. She also admitted that she had tried to kill herself a year before the attempt which led to her being hospitalized. She admitted to using many illegal drugs between the ages of sixteen and twenty. In addition, she admitted that she had taken crystal methamphetamine for the first time on the night she met Lydia, and she was heavily using the drug from November 2001 to January 2002. She insisted, however, that she was not under the influence of any drugs on the night Genter told her how he killed Lydia. She testified that she moved to Houston in October 2001, and Genter called her and asked her to come back and marry him. However, when she returned in November, he had already acquired another girlfriend. Overheu admitted that one reason she did not call the police when Genter confessed to her that he had killed Lydia was because she was afraid the authorities would think she was crazy.
Johnnyce Capps testified that she was Caryn Capps' mother. She testified that she sent pieces of Caryn's clothing to the N.O.P.D., as well as a sample of her own hair. She testified that she also sent the envelope from the last correspondence she received from Caryn in May 2001. She testified that Caryn had two children, and Caryn always contacted the children on their birthdays and holidays. Ms. Capps testified that Caryn did not send a card for one child's birthday in September 2001, nor did she send any cards for the holidays in 2001 or thereafter.
Morhaus testified that he moved into the apartment on South Roberson Street after meeting Sara Ruffner. He testified that he lived with her for one and a half months before she committed suicide. He stated that he came home that night and found her lying half on and half off her bed. He stated that he could not awaken her, and he moved her back onto the bed. He admitted that he did not call for help at that time, but he insisted Ms. Ruffner was on medication, and he thought that was why he could not awaken her. He testified that the next morning he found her dead in the bed. He stated that the police questioned him about the case, but he was never charged in Ms. Ruffner's death because she had left a suicide note. He denied killing her.
Morhaus testified that he first met Lydia at a Goth convention in March 2001. He described her as being approximately 5'4" tall and weighing 100-110 pounds, with dark hair and tattoos. He stated that he met Genter and Kuddes at a theater in March or April 2001, and when he learned that they needed a place to stay, he offered to let them move into his apartment. Morhaus testified that Kuddes lived with them for no more than two months, moving to the North shore after that time. Genter lived with him until October 2001. Morhaus testified that he next saw Lydia in August at a bar in the French Quarter. He stated that he offered to let her stay with him when he learned she had lost her job and that her boyfriend had kicked her *559 out of his apartment. Morhaus testified that Genter was on the North shore when Lydia first moved in, and when Genter returned he and Lydia became sexually involved. Morhaus denied having any relationship with Lydia. He testified that soon after Lydia moved in, she told him she wanted to marry Genter and have his children. Genter told him that Lydia was annoying him and he wanted to get rid of her or kill her. Morhaus testified that Lydia was a heroin addict, but he denied that she ever let drug dealers into the apartment.
Morhaus stated that he arrived home in the early morning hours of 29 August 2001 and found Lydia asleep on a couch in the living room. He stated that he went to his room to check his computer, and about fifteen minutes later Genter walked into his room and told him they had to kill Lydia that night. Morhaus insisted that although he was annoyed by Lydia and her refusal to leave, he did not want her to die, and he argued with Genter about killing her. Genter insisted, and Morhaus said he complied with Genter's demands because he was afraid of Genter. Morhaus testified that they walked into the living room; he noticed that Genter had placed garbage bags around the couch, along with gloves and a pillow. Genter told him that he would smother Lydia while Morhaus held down her legs. Morhaus testified that Genter then put on the gloves, and Morhaus grabbed a garbage bag and placed it around his hands so that he would leave no fingerprints. Morhaus testified that Genter jumped on Lydia, pinning her hands with his legs and holding the pillow over her face. Morhaus grabbed Lydia's legs. Morhaus testified that Lydia stopped moving after a few minutes, and Genter got up, leaving the pillow over her face. Genter then bent Lydia's body, placed it in a garbage bag along with the blanket upon which she was lying and the pillow used to suffocate her, and tied the bag closed. He put this bag in another garbage bag, and then placed that bag in a third bag. Genter put the bag in a lawn chair. Morhaus testified that Genter left the apartment, looking for a place to dump Lydia's body. Genter returned fifteen minutes later and told him there was a dumpster at a school on Nashville Avenue. Morhaus testified that they carried Lydia's body in the chair to the dumpster and put the bag in, leaving the chair on the curb near some trash on the way back to the apartment. Morhaus stated that he went to his room and drank heavily when they got home, not leaving his room until the next day.
Morhaus testified that he and Genter had a party sometime in September at the apartment, and during the party Genter told the guests that two women had died at the apartment. He stated that Genter moved out about a month and a half after the murder, and they did not discuss the murder before Genter left. He testified that they did not remain friends after Genter left.
Morhaus insisted that his statements and testimony about the murder had been consistent. He denied being promised anything in return for his testimony, but he admitted that the state offered to let him plead guilty to being an accessory after the fact to the murder, for which he would receive a sentence of two and a half to five years. He admitted telling the police originally that Lydia had been stealing money from him and Genter, but he told the grand jury that she was stealing only from Genter. He also admitted telling the police that Lydia caused him trouble by visiting him at work for "strange reasons," which he described at trial as visits to get the keys to the apartment a few times when she was locked out. He admitted that he told neither the police nor the grand jury that Genter left the *560 apartment after the killing to find a place to dispose of Lydia's body. Morhaus admitted having a black cape and dark candles at his apartment, but he explained the cape was part of a costume he used in connection with activities with the Society for Creative Anachronism, and he had many different colored candles. He admitted that he had been jailed in Mandeville because he had gotten into analtercation with a young man at a theater, threatening to kill the man. He insisted that he had never been prosecuted on the charges.
The defense played a tape of Morhaus' statement to N.O.P.D. police, which mostly tracked his testimony. In addition, in the tape Morhaus theorized that Genter had killed Lydia because she had become obsessed with Genter. In the tape Morhaus admitted that Lydia was stealing money from both him and Genter. Morhaus admitted that he did not tell the police about the murder when arrested a week after the murder for participating in a fight in Covington, but he insisted that he did not do so because he was afraid of Genter.

Errors Patent/Assignment of Error Four
A review of the record reveals no patent errors.

Remaining Assignments of Error

I.
By his first assignment of error, Genter contends that there is insufficient evidence to support his conviction. Specifically, he argues that his conviction for second degree murder cannot stand because there was no competent evidence to show Lydia was murdered.
The test for determining the sufficiency of evidence to support a conviction was set forth in State v. Armstead, XXXX-XXXX, pp. 5-6 (La.App. 4 Cir. 11/6/02), 832 So.2d 389, 393-394; writ denied, XXXX-XXXX (La.4/21/03), 841 So.2d 791.
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court is not permitted to consider just the evidence most favorable to the prosecution but must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted. The fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall, 523 So.2d 1305; Green, 588 So.2d 757. "[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence." State v. Smith, 600 So.2d 1319, 1324 (La.1992).
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate *561 test from Jackson, but rather is an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
Genter was charged with and convicted of second degree murder, which is defined in pertinent part by La. R.S. 14:30.1 A(1) as: "the killing of a human being ... [w]hen the offender has a specific intent to kill or to inflict great bodily harm." As noted by this court in State v. Leblanc, XXXX-XXXX, p. 6 (La.App. 4 Cir. 11/19/03), 862 So.2d 129, 134:
Specific criminal intent is "that state of mind that exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). The determination of specific criminal intent is a question of fact. State v. Seals, 95-0305 (La.11/25/96), 684 So.2d 368, 373, cert. denied, Seals v. Louisiana, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997). Specific intent may be inferred from the circumstances and the actions of the defendant. Seals, 684 So.2d at 373.
Here, Genter argues that the state failed to prove Lydia was actually killed. He acknowledges that he admitted in his statement that he helped Morhaus dispose of Lydia's body, but he maintains that he cannot be convicted of murder based solely on his own statement. In support, he cites State v. Martin, 93-0285, p. 7 (La.10/17/94), 645 So.2d 190, 195, where the Court stated:
The purpose of the corroboration rule is to test the reliability of a confession and thereby prevent an erroneous conviction based solely on an untrue confession. Warszower v. United States, 312 U.S. 342, 61 S.Ct. 603, 85 L.Ed. 876 (1941). The corroboration requirement has been traced to Perrys' Case, 14 How.St.Tr. 1312 (1660) in England, where the "victim" disappeared and his servant and two others were executed on the basis of the servant's confession before the "victim" reappeared. Corey J. Ayling, Corroborating Confessions: An Empirical Analysis of Legal Safeguards Against False Confessions, 1984 Wis. L.Rev. 1121.
Under the Louisiana corpus delicti rule, an accused cannot be convicted on his own uncorroborated confession without proof that a crime has been committed by someone. State v. Cruz, 455 So.2d 1351 (La.1984). The prosecution, in order to establish guilt, must show that the injury specified in the crime occurred and that the injury was caused by someone's criminal activity. 1 McCormick, Evidence § 145 (John W. Strong ed., 4th ed.1992). The touchstone is trustworthinessan untrustworthy confession should not alone support a conviction, and corroboration is an effective test of the trustworthiness of a person's inculpatory statements.
In Martin, the defendant was charged with first degree murder, committed while in the perpetration of an aggravated rape. There was sufficient independent evidence of the victim's murder in that her strangled body was found, as well as independent evidence to tie the defendant to her murder (she was last seen leaving with him, blood was in his vehicle, et cetera). However, the only evidence of an aggravated rape was the defendant's own statements to witnesses, and the sole issue before the court was whether the defendant could be convicted of first degree murder if the only evidence of the aggravating *562 circumstance was his confessions. The court found that the independent evidence in a murder case must only show that a death was caused by the criminal activity of another, and the aggravating circumstance of the murder could be proven by the defendant's own statements.[2]
Genter also cites State v. Dorsey, 34,977 (La.App. 2 Cir. 9/26/01), 796 So.2d 135, writ denied, 2001-2876 (La.8/30/02), 823 So.2d 941, and 2001-2963 (La.10/14/02), 827 So.2d 414, where the court found sufficient corroborative evidence of murder, even though the victims body was never found. The victim was the defendant's estranged wife. She was last seen at a lounge at closing time, and a few minutes after she left an employee found the victim's purse and a pool of blood next to her car; one of the car's tires was flat due to a nail being driven into it. Police officers responding to the call from the employee found a large pool of blood, a gun clip containing live rounds lying in the blood, a blood trail, and drag marks indicating a body had been dragged. In addition, they found the victim's shoes. Soon thereafter, they discovered blood on the defendant's SUV's bumper, and further investigation revealed blood inside the SUV and the defendant's house. A witness who lived near the bar testified that the defendant visited her house shortly before the victim was last seen alive, and the defendant obtained from the victim a nail similar to that found in the victim's car's tire. The victim was described as a responsible worker, and she and the defendant had a tumultuous relationship wherein he had beaten her in the past. In addition, he had threatened her friends and coworkers. Other witnesses testified they saw the defendant with a gun in the days before the victim's disappearance, and he was angry with the victim at that time. DNA testing of the blood found at the scene conclusively matched samples taken from the victim's parents and children. An expert testified that the amount of blood found at the scene would have comprised 43 of the victim's blood volume. Given these factors, the court found that there was sufficient circumstantial evidence to prove the victim had been murdered and that the defendant had committed the murder.
Genter argues that the independent evidence presented in Dorsey so far outweighed the independent evidence in this case that Lydia is dead as to render the evidence in this case inconclusive. However, the court in State v. Vinet, 529 So.2d 1334 (La.App. 5 Cir.1988), found sufficient evidence of a murder without the wealth of circumstantial evidence present in Dorsey. In Vinet, the victim was the captain of a boat upon which the defendant was a deckhand. The defendant and the victim dropped off a passenger and were supposed to return for him the next day. However, the captain was never seen again, and the defendant eventually confessed that he had killed him and thrown his body overboard at sea. The defendant was charged with and convicted of manslaughter; on appeal he argued that his conviction could not stand because the only evidence of a killing was his own confession. The court disagreed, pointing to large quantities of blood found in the galley of the boat, as well as pieces of the victim's and the defendant's clothing, which the authorities found on the ocean floor near a rig to which the boat had been moored; it was determined these pieces of clothing had been weighted down. The *563 court found this independent evidence proved the victim had been murdered.
Likewise, in State v. Wright, XXXX-XXXX (La.App. 3 Cir. 3/5/03), 839 So.2d 1112, the court found sufficient independent evidence to show a murder had been committed. The victim had been missing for two years and was last seen entering the defendant's house. Human bones were found under a house across the street from the defendant's house, and DNA evidence linked the bones to the victim. A neighbor testified that she heard banging coming from the defendant's house on the night the victim disappeared, but she believed at the time that the defendant was engaging in sex. She testified that she later saw the defendant mopping his floor and carrying a big garbage bag from his house. The defendant told various people he had killed the victim, and he eventually confessed to the police that he had killed her. On appeal, he argued that the evidence was insufficient because there was no evidence, other than his confession, that the victim had been murdered. The court disagreed, noting the physical evidence, including the fact that the body was found wrapped in a sheet, as the defendant had described. He further argued, as does the appellant here, that the veracity of the witnesses who testified he had confessed to them was "highly questionable." The court rejected this argument, noting that the witnesses themselves were questioned extensively, including questions concerning prior convictions, and the jury evidently believed their testimony.
Here, the state did not present as much independent physical evidence of Lydia's murder as that presented in Dorsey, Vinet, and Wright, but it did present independent testimonial evidence to establish she was dead. The state established that the last time Lydia contacted her family in Texas, three months before the alleged murder, she was in New Orleans. In addition, various witnesses not connected to the murder testified that the person they saw with Genter and Morhaus the Saturday before the murder was Lydia. The state established that Lydia was Caryn Beth Capps, both through identification testimony by Morhaus and the victim's mother, and through DNA comparisons of the victim's mother's hair with hair found under the couch where Morhaus testified that the murder occurred. Contrary to Genter's arguments, the state also presented testimony that Lydia was murdered not only through Genter's confessions to Kuddes and Overheu and his own statement to the police, but also through the confession and testimony of Morhaus. Thus, although the physical evidence of Lydia's death was lacking, the state presented the eyewitness testimony of Morhaus, whose admitted involvement in the murder was to such an extent that he could have been charged as a principal to the murder. Therefore, there was independent evidence of the victim's murder.[3]
*564 Genter argues that Morhaus' testimony was not sufficient to show Lydia was murdered because Morhaus' involvement was so extensive that any testimony he gave implicating Genter as the person who smothered Lydia was too suspect to be believable. He notes that although Morhaus admitted fully participating in the murder, he was charged only with being an accessory after the fact to the murder, thus being exposed to only a five-year sentence rather than a life sentence. However, defense counsel fully cross-examined Morhaus on this point, and the jury was aware of the plea agreement for Morhaus to testify against Genter in exchange for a maximum sentence of five years. The jury was also aware that Morhaus had been involved in a fight with a youth a week after the murder. A fact-finder's credibility decision should not be disturbed unless it is clearly contrary to the evidence. State v. Huckabay, XXXX-XXXX (La.App. 4 Cir. 2/6/02), 809 So.2d 1093, writ denied, XXXX-XXXX (La.11/1/02), 828 So.2d 564; State v. Harris, 99-3147 (La.App. 4 Cir. 5/31/00), 765 So.2d 432. The jury was able to observe Morhaus' demeanor and apparently found his testimony credible. Contrary to Genter's argument, there is nothing in the record to convince this court that the jury abused its discretion by so finding. Based upon Morhaus' testimony, the state presented sufficient evidence that Lydia died as a result of criminal actions on the part of Morhaus and Genter. Thus, independent evidence was presented to show her murder, and the evidence as a whole supported the jury's finding that Genter killed Lydia with the specific intent to kill or inflict great bodily harm. This assignment has no merit.

II.
By his second assignment, Genter contends that the trial court erred by denying his motion for mistrial, raised after Overheu testified that Genter threatened to kill her. The passage to which Genter refers occurred during the direct testimony of Overheu, after she had testified that Genter confessed to her that he killed Lydia and described the killing:
Q. Why are you here today?
A. Because justice needs to be served.
Q. And has the D.A.'s office promised you anything for this?
A. No.
Q. Have we given you anything?
A. No. It's just my belief in God. Since I found God I believe what has to be done, it has to be done right, you know.
Q. Have you ever thought that since Ted [Genter] told you how he killed Lydia, do you ever wonder if it could be you?
A. Yes.
Q. And why?
A. Because the last time that I really, basically saw him was, I think, the last week of November. He came to my housebecause he and I stopped talking. He stopped talking to me. I still don't know why. But I wrote him a letter saying I missed him and I loved him and I wanted to see him again, you know.
Q. And were you livingwhere were you living at the time you wrote this letter?
A. On Madison Street in Mandeville.
Q. Okay.
A. And he decided to come over with a friend and the friend left us alone. And he had told me, you know, that he was really hurt in this world and he didn't know what to do anymore and that nobody took him seriously for what he, you know, who he was.

*565 Q. And did you feel like this was [a] heart felt conversation?
A. He cried. But also it was weird becauseI remember sitting on the couch and he said to me, "I know where you live. I know where you sleep. If you ever leave me, if you ever hurt me, I will kill you."
Q. And was this after he was getting emotional and cried?
A. This was before being emotional.
Q. Before?
A. Yeah.
Q. And did you take that threat seriously?
A. Yes, I did. And that's when I stopped all contact with him.
Q. And thank you.
A. You are welcome.
At that point, defense counsel requested a bench conference, and on the record out of the jury's presence moved for a mistrial based upon the state's failure to give notice of the other crimes evidence, the death threat to Overheu, as required by La. C.E. art. 404B.[4] The court refused to grant a mistrial, finding the statement "in the totality of the testimony is not to such a level of prejudice or inflammatory nature that it has prejudiced the defendant irreparable [sic] for the remainder of the trial." The court offered to admonish the jury to disregard Overheu's testimony. Defense counsel countered that an admonition would not cure the error, but he did not object to the court giving the admonition. When the jury returned, the court stated:
Ladies and gentlemen, the last testimony that you heard coming from the witness stand about a conversation between the witness and the defendant, you are to disregard that testimony, the last portion of that testimony, is as not having happened. You are not to draw any inference from it and you are to treat it as if it was never said.
Later, after the jury had retired to deliberate, the following occurred:
All right. Let's bring the jury back in. Let the record reflect the defendant is present with counsel. The jury has come back into the court and pursuant to two written questions given to the deputy to pose to me [sic].
The first question being for the Court, "to tell the jurors what part of Marissa [sic] Smith-Oveheu's [sic] testimony the Court admonished to disregard"?
I cannot answer that. You're going to have to rely on your memory of that portion of the testimony when that came in.
Genter now argues that the trial court erred by denying the mistrial because the statement was a solicited improper reference to another crime committed by him, that being a death threat to Overheu. La. C.Cr.P. art. 770 provides in part that the trial court must grant a mistrial when requested "when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, *566 during the trial or in argument, refers directly or indirectly to: ... (2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible ... An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial." Here, the state argues article 770 is not applicable to this case because the comment was made by Overheu, who is not a court official, and the prosecutor did not solicit Overheu's reference to the death threat. Contrary to the state's argument, a reading of the passage shows that the prosecutor solicited this testimony. Because the reference to the death threat was solicited by the prosecutor, the statement can be imputed to the district attorney, and the court should have granted the mistrial under article 770. See State v. Juarbe, 2001-2250 (La.App. 4 Cir. 7/31/02), 824 So.2d 1240, writ denied, State ex rel. Juarbe v. State, 2002-2846 (La.10/31/03), 857 So.2d 467; State v. Dillion, 99-2175 (La.App. 4 Cir.2000), 770 So.2d 13.
However, where a trial court erroneously fails to grant a mistrial under La.C.Cr.P. art. 770, such error is considered a "trial error" and is to be reviewed subject to a harmless error analysis and standard. See State v. Johnson, 94-1379 (La.11/27/95), 664 So.2d 94; Juarbe, supra; State v. Johnson, 97-1394 (La.App. 4 Cir. 11/18/98), 723 So.2d 1028. In State v. Dangerfield, 2000-2359, pp. 9-10 (La. App. 4 Cir. 4/3/02), 816 So.2d 885, 895, writ denied, XXXX-XXXX (La.11/22/02), 829 So.2d 1038, this court set forth the harmless error standard:
The test used in deciding if a trial error is harmless is whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).
The Chapman standard was later refined in Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993), as follows:
Consistent with the jury-trial guarantee, the question [Chapman] instructs the reviewing court to consider is not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand.... The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error.
See also Juarbe, supra.
Here, it appears that the admonition did not completely strike Overheu's statement from the jurors' minds; they requested further instruction on what they were supposed to disregard. Nonetheless, it does not appear that the trial court's failure to grant the mistrial mandates a reversal of Genter's conviction. Besides Overheu's testimony that Genter confessed to her that he smothered Lydia, the state also presented Kuddes' testimony that Genter confessed the same thing to him. In addition, the state presented the testimony of Morhaus, who testified that he helped Genter smother Lydia. It must be noted that Morhaus' testimony as to the method of Lydia's killing matched Genter's alleged confessions to both Overheu and Kuddes. Given this evidence, it does not appear that Overheu's testimony about Genter threatening to kill her led the jury to convict Genter; thus, the comment did not contribute to the jury's verdict. Thus, the trial court's failure to grant the mistrial *567 was harmless. This assignment has no merit.

III.
By his final assignment, Genter maintains that the trial court erred by denying his motion to suppress his statement. Specifically, he argues that the part of the statement wherein he admitted helping Morhaus dispose of Lydia's body should have been suppressed because it occurred after he indicated to Detective Liberto that he was invoking his right to counsel.
In State v. Vigne, 2001-2940, p. 6 (La.6/21/02), 820 So.2d 533, 537, the court set forth the standard for determining whether a statement was voluntarily made:
A trial judge's ruling on whether or not a statement is voluntary is given great weight and will not be disturbed on appeal unless clearly unsupported by the evidence. State v. Thornton, 351 So.2d 480, 484 (La.1977). Before a confession may be introduced into evidence, the state must establish that the accused was advised of his constitutional rights under Article 1(sic), Section 13 of the Louisiana Constitution and the Supreme Court's decision in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); State v. Simmons, 443 So.2d 512 (La.1983). In Miranda, the United States Supreme Court recognized the coercive atmosphere created by police custody and established a procedural mechanism to safeguard the exercise of a defendant's Fifth Amendment rights. Before interrogating a suspect in custody, law enforcement officials must inform the suspect that he has the right to remain silent, that his statements may be used against him at trial, that he has a right to an attorney, and that if he cannot afford an attorney, one will be appointed for him.
Even when a defendant has not expressly invoked his rights under Miranda, "[t]he courts must presume that a defendant did not waive his rights." North Carolina v. Butler, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979). A waiver is not established by showing that a defendant was given the complete Miranda warnings and thereafter gave an incriminating statement. 2 Wayne R. LaFave, Jerold Israel, Nancy King, Criminal Procedure, § 6.9(d). Moreover, it is well-settled that a "heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." Tague v. Louisiana, 444 U.S. 469, 470, 100 S.Ct. 652, 653, 62 L.Ed.2d 622 (1980).
In State v. Payne, XXXX-XXXX (La.12/4/02), 833 So.2d 927, the defendant was arrested, and as she was standing outside the police car, an officer took a cell anphone from her hand. She spoke with another person who was arrested at that time and asked if she should call her father-in-law, who was an attorney. The defendant then picked up the cell phone from the top of the car, but the officer took the cell phone away from her again. The defendant then stated: "May I call a lawyercan I call a lawyer?" The officer pushed the phone away from her and told her, "you don't need this." Although the officer testified that he did not hear the defendant make this statement, the trial court found the defense witness' testimony on this point more credible and suppressed the confession. The court of appeal affirmed the ruling, finding the issue was one of credibility. On review, the Supreme court reversed. The court upheld the trial court's credibility finding, but it found the defendant's "invocation" of the right to an attorney was so ambiguous that *568 the officer was not obligated to refrain from any questioning. The court noted:
The applicability of the "`rigid' prophylactic rule" of Edwards requires courts to "determine whether the accused actually invoked his right to counsel." Davis v. United States, 512 U.S. [452] at 458, 114 S.Ct. [2350] at 2355[, 129 L.Ed.2d 362 (1994)] (emphasis in original) (citations omitted). To avoid difficulties of proof and to provide guidance to officers conducting interrogations, this is an objective inquiry. Davis, 512 U.S. at 458-459, 114 S.Ct. at 2355. Invocation of the Miranda right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." Davis, 512 U.S. at 459, 114 S.Ct. at 2355 (citation omitted). If a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable police officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, the cessation of questioning is not required. Id. (emphasis in original). The suspect must articulate his desire to have counsel present with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. Id. (emphasis supplied)
Payne at pp. 9-10, 833 So.2d at 935. The court discussed Soffar v. Cockrell, 300 F.3d 588 (5th Cir.2002), where the Fifth Circuit en banc found the defendant's questions to officers as to whether he should get an attorney, how he could get an attorney, and how long it would take to get an attorney were too equivocal to constitute a clear invocation of the defendant's right to counsel. The court also noted State v. Abadie, 612 So.2d 1 (La.1993), where the court found the defendant had unequivocally invoked his right to counsel by twice asking to speak to an attorney and attempting unsuccessfully to contact one. The court then discussed Davis v. United States, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), which addressed the issue of whether a defendant has actually invoked his right to counsel:
In Davis, the Supreme Court declared that the suspect must "unambiguously request" counsel "sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney" in order to cease custodial interrogation. Davis, 512 U.S. at 459, 114 S.Ct. at 2355. The United States Supreme Court specifically declined to extend Edwards and require law enforcement officers to cease questioning immediately upon the making of an ambiguous or equivocal reference to an attorney. Id. In declining to extend Edwards the Court stated:
The rationale underlying Edwards is that the police must respect a suspect's wishes regarding his right to have an attorney present during custodial interrogation. But when the officers conducting the questioning reasonably do not know whether or not the suspect wants a lawyer, a rule requiring the immediate cessation of questioning "would transform the Miranda safeguards into wholly irrational obstacles to legitimate police investigative activity," Michigan v. Mosley, 423 U.S. 96, 102, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975), because it would needlessly prevent the police from questioning a suspect in the absence of counsel even if the suspect did not wish to have a lawyer present. Nothing in Edwards requires the provision of counsel to a suspect who consents to answer questions without the assistance of a lawyer.... We *569 also noted [in Miranda v. State of Arizona, 384 U.S. 436 at 485, 86 S.Ct. 1602 at 1633, 16 L.Ed.2d 694 (1966)] that if a suspect is "indecisive in his request for counsel," the officers need not always cease questioning. Davis, 512 U.S. at 460, 114 S.Ct. at 2355-2356.
The Court held that after a knowing and voluntary waiver of the Miranda rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney. Id., 512 U.S. at 461, 114 S.Ct. at 2356. Davis established a bright-line rule, under which "a statement either is such an assertion of the right to counsel or it is not." Soffar v. Cockrell, 300 F.3d at 595 (citing Davis, 512 U.S. at 459, 114 S.Ct. at 2355).
Payne, at pp. 12-13, 833 So.2d at 937. The court found the defendant's statements did not invoke her right to counsel. The court noted: "The suspect must articulate her desire for counsel clearly and unambiguously such that a reasonable police officer would understand the statement to be a request for counsel." Id. at pp. 15-16, 833 So.2d at 939.
Likewise, in State v. Chesson, 2003-606 (La.App. 3 Cir. 10/1/03), 856 So.2d 166, the defendant indicated he "felt like" he "might should talk to an attorney." The court found this statement was not an unequivocal invocation of the defendant's right to counsel, and there was no basis to suppress his confession. In State v. Cooper, 36,830 (La.App. 2 Cir. 3/5/03), 839 So.2d 995, writ denied, XXXX-XXXX (La.10/10/03), 855 So.2d 330, after the twenty-year-old defendant waived his rights, his father, who was present during the interrogation, stated that he might want an attorney later. The court found this statement did not rise to an unequivocal invocation of the defendant's right to counsel.
By contrast, in State v. Coston, 98-0470 (La.App. 4 Cir. 9/16/98), 720 So.2d 714, this court found the state failed to prove the defendant knowingly waived his right to counsel. The state sought to introduce an unrecorded statement that the defendant made prior to the start of a taped recording; the defendant invoked his right to counsel at the beginning of the tape, and the statement concluded at that point. The officer who took the statement testified that the defendant first spoke with him and gave an oral statement, and prior to this statement he was advised of his rights and waived all of them, including his right to counsel. The officer insisted the defendant did not ask for an attorney until the officer sought to take a taped statement. However, the tape itself showed that the defendant had asked for an attorney prior to making the unrecorded statement and was told that it was too late at night to find one. In addition, the defendant had not initialed the waiver form as to his waiver of his right to counsel.
In State v. Williams, 99-2355 (La.App. 4 Cir. 12/13/00), 776 So.2d 604, writ denied, State ex rel. Williams v. State, XXXX-XXXX (La.4/12/02), 812 So.2d 667, the defendant was wanted in connection with a murder and surrendered to an assistant district attorney. The assistant district attorney filled out a waiver form, and the defendant indicated he wanted an attorney. The assistant district attorney stopped the questioning, but the defendant then burst into tears and confessed. On appeal of his manslaughter conviction, this court found the statement was admissible because the defendant volunteered his confession. This court found the confession was not a product of interrogation or "other compelling influences," and this court further *570 found that the defendant waived his invocation of his right to counsel by spontaneously confessing.
In State v. Gilliam, 98-1320 (La.App. 4 Cir. 12/15/99), 748 So.2d 622, the sixteen-year-old defendant and his mother went to the police station, where the defendant gave an oral incriminating statement. When the officers indicated they wanted to tape his statement, he asked for an attorney. The tape was shut off, and four minutes later the tape was restarted with the notation that the defendant had waived his right to counsel. The defendant then gave a statement wherein he incriminated himself and his brother. One officer testified that during the time the tape was stopped, both the defendant and his mother agreed to continue the statement because no attorney was available at that time. Another officer testified the defendant told him that he initially invoked his right to counsel because he feared that a waiver at that point would constitute a waiver later when the case went to trial. On review, this court found the state failed to show the taped statement was voluntary. This court found the "request for counsel followed quickly by a waiver suggests confusion at best, especially when accompanied by confusing warnings." Id. at 14, 748 So.2d at 631. This court pointed to the fact that the defendant was told no counsel was available at that time and to the defendant's confusion about any waiver of counsel being permanent. This court inferred from the facts of the case that if counsel had been "available," the defendant would have invoked his right to have counsel present. This court also noted there was no indication the defendant was even afforded the opportunity to call an attorney.
In State v. Tilley, 99-0569 (La.7/6/00), 767 So.2d 6, the defendant was arrested on the scene of the murder and advised of his rights. During booking at the police station, an officer again advised the defendant of his rights, and at that point the defendant invoked his right to counsel. The officer stopped all questioning and began booking the defendant. During fingerprinting, the defendant told the officer he had changed his mind and wanted to give a statement without counsel present. The officer again advised the defendant of his rights, and the defendant gave two taped statements. There was no evidence that the officer neither reinitiated questioning prior to the waiver, nor was there any evidence of any promises or inducements. The court upheld the trial court's ruling that these statements were admissible, finding the defendant himself reinitiated the questioning and voluntarily waived his right to counsel.[5]
Here, Genter does not dispute he was fully advised of his Miranda rights. Indeed, the various videotapes show that he was advised of his rights many times, not only by Detective Harbin but also by his I.D.B. attorney, who was appointed to represent him in connection with the charges against him in St. Tammany Parish and who visited him during the interview. Genter contends, however, that he invoked his right to counsel during his statement, yet Detective Liberto continued questioning him, and it was only after this ignored invocation that he admitted that he helped Morhaus dispose of Lydia's body. During the statement, after the attorney left and while the appellant was in the interrogation *571 room with only Detective Liberto, the officer began asking him about Lydia's disappearance. At one point, Genter stated: "I already told you everything and if this is gonna [sic] continue I'll just wait for a lawyer." During the hearing on Genter's motion to suppress his statement, Detective Liberto first testified that Genter never asked for an attorney. Detective Liberto then stated the appellant made some statement about speaking with an attorney, and he (Detective Liberto) told him he could, but Genter continued talking. The parties then viewed the videotape, after which Detective Liberto stated that he never heard Genter's comment about a lawyer.
Genter's statement, "I already told you everything and if this is gonna [sic] continue I'll just wait for a lawyer," is not considered an unequivocal invocation of his right to counsel. In fact, it appears to be much less of an invocation than that of the defendant in Payne, supra, where the defendant asked if she could call an attorney, and the court in Payne found this question did not unequivocally show the defendant was trying to invoke her right to counsel. Genter's statement seems much closer to that in Chesson, supra, were the court upheld the admissibility of the defendant's confession. Given the holding of Payne, it appears the trial court properly denied the appellant's motion to suppress his statement. This assignment has no merit.
Accordingly, because Genter's assignments of error are without merit, his conviction and sentence are affirmed.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] William Morhaus was also charged in the same indictment with being an accessory after the fact to this murder. On 7 March 2002 he pled guilty as charged, and the court sentenced him on 8 August 2003 to serve four years at hard labor. He is not a party to this appeal.
[2] See also State v. Thibodeaux, 98-1673 (La.9/8/99), 750 So.2d 916, where the Court found independent evidence established the murder, and the defendant's confession was sufficient to establish the aggravating circumstance.
[3] See State v. Robinson, 34,383 (La.App. 2 Cir. 2/28/01), 780 So.2d 1213, writ denied. XXXX-XXXX (La.3/28/02), 812 So.2d 642, where the court reversed the defendant's conviction for one count of kidnapping. Although the defendant confessed to kidnapping the victim, the victim refused to testify against the defendant and identified only the codefendant and a third man as the perpetrators. The codefendant testified the victim willingly got into the men's car in the absence of any threats or weapons. In reversing the defendant's conviction, the court noted: "We emphasize that the result in this case would be different had [the victim] testified at trial or if the co-defendant ... had testified more positively. Without a positive statement that [the victim] was forcibly seized or imprisoned, this conviction can not stand. The corpus delicti has not been shown." Id. at 11, 780 So.2d at 1220.
[4] La. C.E. art. 404 B(1) provides:

B. Other crimes, wrongs, or acts. (1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
[5] See also State v. Tapp, 99-2279 (La.App. 4 Cir. 5/30/01), 788 So.2d 1215, writ denied, XXXX-XXXX (La.5/24/02), 816 So.2d 298, where this court used this analysis to find a defendant voluntarily reinitiated contact with the police after invoking his right to remain silent.